**Librairie Artheme FAYARD, Plaintiff,**

v.

**HENRY HOLT & COMPANY, INC., Defendant.**

**No. 88 Civ. 1744(RJW).**

United States District Court, S.D. New York.

Nov. 20, 1989.

Wormser, Kiely, Galef & Jacobs, New York City (Lawrence M. McKenna, of counsel), for plaintiff.

Satterlee, Stephens, Burke & Burke, New York City (Robert M. Callagy, Mark A. Fowler, of counsel), for defendant.

ROBERT J. WARD, District Judge.

This action arises out of a dispute over the rights to publish the autobiography of Lech Walesa ("Walesa"), the Nobel laureate and world renowned leader of the Solidarity labor movement in Poland. The dispute originated during a time when the attempt to tell the life story of Walesa, a symbol of the opposition to the communist government in Poland, was an endeavor necessarily shrouded in secrecy. Plaintiff, Librairie Artheme Fayard ("Fayard"), a societe anonyme organized under the laws of the France, and defendant, Henry Holt & Company, Inc. ("Holt"), a New York corporation, are competing publishing companies, each of which sought to play a part in bringing Walesa's story out of Poland, and, in the finest of capitalistic traditions, to reap a profit for their efforts. They have become entangled in a legal morass concerning the publishing rights to the book that was ultimately written by Walesa and his associates.

Fayard has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on its claims that Holt breached its obligations under a contract it entered into with Fayard to publish an English translation of the Walesa autobiography. Fayard also seeks summary judgment on Holt's counterclaims which allege that Fayard tortiously interfered with Holt's rights to publish Walesa's autobiography under a prior contract and breached its own obligations under the contract between the parties. For the reasons that follow, the motion is granted.

## BACKGROUND

On or about April 10, 1984, an agreement (the "Walesa–Andrews Agreement") was signed by Bogdan Lis, as agent and personal representative for Walesa, and Ralph Andrews, as president of Ralph Andrews Productions, Inc. (collectively "Andrews").[1] In this agreement, Walesa granted Andrews the "exclusive rights throughout the world to develop an authorized biographical book" and a motion picture or television production based on Walesa's life and the Solidarity movement. The Walesa–Andrews Agreement provided that Andrews' rights to produce a movie or publish a book were to last "for a period of six months commencing as of the date hereof," and that if, within six months, a commitment had been made by a publisher for a book, or if production had started on a motion picture, then the rights were to be extended for a year to permit completion of the project. The agreement specifically noted that Andrews' rights would expire if not exercised within the agreed period.[2]

---

1. A copy of the Walesa–Andrews Agreement, in Polish, is annexed as exhibit C to the Answer, filed on May 2, 1989; a copy of an English translation of the same agreement is annexed as Exhibit 3 to the Affidavit of Claude Durand, filed under seal on June 2, 1989 (the "Durand Affidavit").

2. The terms of the contract were summarized by Andrews in the first paragraph of the agreement as follows:

[t]his is to confirm an agreement wherein you have granted to Ralph Andrews Productions, /"Andrews"/ the exclusive rights throughout the world to develop an authorized biographical book to be authorized [sic] by a writer to be approved by you or your authorized representatives and motion picture or television production based on your life and Solidarity—for a period od [sic] six months commencing as of the date hereof. It is agreed

The Walesa–Andrews Agreement took the form of a letter from Andrews to Walesa. In recognition of the precarious political situation in Poland at that time, the Walesa–Andrews Agreement specified certain of Walesa's duties under the contract as follows:

> [t]o the extent permitted by law and public authority and consistent with your welfare and safety and that of your family, friends and the Solidarity movement, you will cooperate in the writing of the book and the script furnishing material and assistance in connection with this undertaking. However, it is understeed [sic] and agreed that your current circumstances are not likely to permit you to co-operate [sic] in the normal manner and that substantially most of [the] materials could be prepared by persons authorized by you and consultations shall be conducted with them. It is the essence of this agreement that these persons will provide us with applicable material about your life and the Solidarity movement.

Exhibit 3, annexed to the Durand Affidavit.

In or about May 1984, Andrews approached Holt with a proposal to publish the autobiography of Walesa. Andrews and John Macrae III ("Macrae"), editor-in-chief of Holt's Adult Trade Department, reached an agreement in principle that Holt would publish the autobiography. In June 1984, they travelled to Gdansk to meet with Walesa and his representatives. Macrae discussed the specifics of the publishing arrangement with Walesa and Marian Terlecki ("Terlecki"), the writer Walesa had designated to collaborate with him on the project. Holt maintains that after these meetings, Walesa approved the selection of Holt as the publisher of the autobiography.

Accordingly, on or about July 17, 1984, Holt signed an agreement with Andrews to publish Walesa's autobiography (the "Holt–Andrews Agreement").[3] The Holt–Andrews Agreement states that it "is predicated upon the existence of a valid agreement between Ralph Andrews Productions and 'Anonymous' and 'Anonymous' representatives." The parties agree that Walesa was the unnamed figure referred to in this passage. Upon execution of the Holt–Andrews Agreement, Andrews delivered a copy of the Walesa–Andrews Agreement to Holt in order to substantiate his claim of exclusive rights to the autobiography. Exhibit B, annexed to the Answer.

The Holt–Andrews Agreement provided that Andrews was to deliver to Holt two copies of the complete manuscript of the book on or before September 1, 1985. *Id.* at ¶ 4. The percentage compensation Andrews was to receive from the sale of the autobiography was spelled out, and Holt agreed to advance Andrews $270,000.00. The advance payment was to occur as follows: $25,000.00 upon signing the agreement, $20,000.00 upon delivery and approval as to content and style of a portion of the manuscript of approximately 75,000 words, and $250,000.00 upon delivery and acceptance of a complete manuscript by September 1, 1985. *Id.* at ¶ 7. Holt and Andrews agreed that $250,000.00 of the $270,000.00 was to be received by "Anonymous" or his designee. Upon execution of the agreement, Holt paid Andrews the initial $25,000.00 advance.

In the event Holt did not publish the autobiography, it was protected from loss of the advance outlays to Andrews in a number of specific ways under the Holt–Andrews Agreement. First, the contract provided that "[i]f, in [Holt's] sole opinion, the delivered manuscript is unacceptable, [Andrews] will be free to place the manuscript elsewhere, with the proviso that any contract entered into with a third party

that if, within the six-month period, a commitment has been made with a publisher for a book and/or Andrews have [sic] started production of a movie, then the rights previously [sic] granod [sic] shall be extended for a period of one year to permit completion of the production or publication.

The rights to produce or publish shall expire if not exercised [sic] within the agreed period. If the book is published or the movie is produced—then the right to exploit shall be continuing, subject to the terms hereof.
Exhibit 3, annexed to the Durand Affidavit.

**3.** This agreement is annexed as Exhibit B to Holt's answer.

herein, will provide for the direct and prompt repayment to [Holt] of all sums advanced by [Holt] hereunder...." *Id.* at ¶ 20. In addition, a footnote to paragraph 20 stated that: "[i]f the full and complete manuscript is not delivered in a timely fashion, as indicated by the terms of this agreement, then [Holt] is to be reimbursed all monies advanced by it within a period of thirty days."

By the terms of the Walesa–Andrews Agreement, the execution of the Holt–Andrews Agreement extended Andrews' exclusive rights to the autobiography for a period of one year. On or about March 30, 1985, Walesa and Andrews entered into a further agreement, which confirmed and modified the Walesa–Andrews Agreement (the "Modification Agreement").[4] The Modification Agreement was devoted primarily to outlining the details of the proposed motion picture of Walesa's life. Within the general discussion of the film rights to Walesa's story, the parties agreed that the "term of the [Walesa–Andrews Agreement] has been extended through December 31, 1985." In addition, the Modification Agreement expressly stated that "[n]othing contained herein shall be deemed to modify any provisions in the [Walesa–Andrews Agreement] relating solely to the book."[5]

According to Holt, the initial preparation of the autobiography progressed smoothly, and Walesa and Terlecki delivered an outline of the draft manuscript to it by the end of the summer of 1984, in accordance with the Holt–Andrews Agreement. In or about December 1984, Holt forwarded Terlecki an additional $5,000.00 to help defray expenses. In or about March or April 1985, Holt learned that Terlecki had been arrested. In a letter dated June 1, 1985, Maciej Grzywaczewski ("Grzywaczewski"), a personal representative of Walesa, contacted Holt and expressed concern that Terlecki's participation in the book project might have triggered his arrest and that the arrest might delay the delivery of the manuscript to Holt. Exhibit G, annexed to affidavit of John Macrae, filed under seal on July 25, 1989.

Meanwhile, Holt was negotiating with several other publishers interested in obtaining sublicensing rights to the autobiography. By the end of 1985, Holt asserts that it had entered agreements regarding the autobiography with seven different publishers in Europe. Terlecki, however, continued to be imprisoned during the fall of 1985, and a final version of the manuscript was not delivered to Holt by September 1, 1989. No book was published by December 31, 1985.

According to Fayard, in early 1986, a publisher affiliated with it was approached by Pierre Cottin ("Cottin"), a French journalist, concerning the possibility of publishing a book on Walesa's life. The affiliated publisher contacted Fayard and referred Cottin to Claude Durand ("Durand"), president of Fayard. Durand met with Cottin at the end of January or the beginning of February 1986, and they discussed the possibility of publishing an autobiography of Walesa. Cottin then travelled to Poland and, using a code agreed upon with Durand in order not to alert the Polish authorities, advised Durand over the telephone that Walesa had agreed to such a proposal.

In February 1986, Durand met with Grzywaczewski and inquired whether Walesa had any commitments with others to publish his story. Durand maintains that the answer to his inquiry was no, and that he was not informed of the Walesa–Andrews or Holt–Andrews agreements at this time.

Grzywaczewski sent a letter to Macrae, dated February 26, 1986, in which he stated that Walesa had definitely abandoned the book collaboration project and wanted to make the situation clear in order to com-

---

**4.** The Modification Agreement is annexed as Exhibit 5 to the Durand Affidavit.

**5.** The Modification Agreement also took the form of a letter from Andrews to Walesa. In paragraph 4, Walesa confirmed that neither he nor his representatives had granted the rights under the Walesa–Andrews Agreement to any other person or entity, but this confirmation was limited by a handwritten addition at the end of this paragraph which read "till Dec. 31, 1985."

pensate Holt for the efforts it had made. The letter requested that Holt offer its opinion on several areas of inquiry including: (1) what charges it had incurred, (2) if it intended to try to recoup these charges and, if so, from whom, and (3) whether Holt believed it still had a valid right to publish the autobiography despite the expiration of the Walesa–Andrews Agreement and the Modification Agreement.

Subsequently, Walesa entered into a contract with Fayard, dated March 26, 1986, granting Fayard the exclusive worldwide rights to publish Walesa's autobiography. Fayard contends that is was first advised of the earlier agreements by Walesa's representatives in or about April 1986. On or about May 28, 1986, the Fayard–Walesa Agreement was supplemented, at the request of Walesa, with a rider containing a variety of additional provisions (the "Rider").[6] A section entitled "Additional special clauses" was also included, paragraph 1 of which acknowledged that Fayard had been informed of the prior negotiations between Walesa and Holt. In the Rider, Walesa confirmed for Fayard that the negotiations with Holt had terminated without result and that the Walesa–Andrews Agreement, as well as the Modification Agreement, had expired and were no longer in effect. Walesa agreed to forward a "letter of denunciation" to Ralph Andrews Productions, Inc. to further confirm the expiration of these agreements. An indemnification clause was included in the Rider which stated that:

> [t]aking into consideration these confirmations and subject to the sincerity thereof, Fayard Publications shall respond in the place of the Author to each claim possibly stemming from the previous commitments mentioned above.

In or about July 1986, Holt, aware of the agreement between Walesa and Fayard, contacted Fayard and arranged to meet with Durand. At this meeting, Macrae argued that Holt maintained the rights to the Walesa autobiography. The dispute between Holt and Fayard raged on into 1987. Richard Seaver ("Seaver"), the president and publisher of the trade division of Holt, met with Durand several times in early 1987 in an attempt to resolve their differences. After a number of negotiation sessions held in Paris during March 1987, Seaver and Durand agreed to work together to publish the autobiography. Durand sent a letter to Seaver summarizing the terms upon which they had agreed to establish a contract. This letter, dated March 25, 1987, and signed by Seaver on March 26, 1987, provided for the execution of a final contract between the parties on May 1, 1987.

In early April 1987, Fayard delivered the galley proofs of the French version of the autobiography, entitled *Un Chemin D'Espoir*, to Holt. Holt immediately voiced concerns with the text of the manuscript. Soon thereafter, Fayard informed Holt that it was accelerating the publication schedule for the French edition of the book from the agreed upon date of May 1 to April 22, 1987. Holt, once again, strongly objected.

Holt, in response to Fayard's request for a list of its proposed changes to the manuscript, stated, in a telex from Macrae, dated April 15, 1987, that it was "impossible to pass on suggested changes to you as they are so extensive as to require new Polish text. In short, current manuscript is unacceptable in form and content." Exhibit 17 annexed to Durand Affidavit. In a telex dated April 22, 1987, Seaver reiterated these concerns to Durand and indicated that Holt would need to negotiate further with Fayard to reach an agreement on the project to publish the autobiography. Exhibit 22 annexed to Durand Affidavit. The next day, Seaver sent another telex to Durand in which he stated that Holt could not conclude an agreement with Fayard regarding the autobiography, largely because of the state of the manuscript and Holt's belief that it was in need of substantial editorial revisions. Exhibit 24 annexed to Durand Affidavit. The telex ended with

---

**6.** A copy of the Rider in Polish, and its English translation, are annexed as Exhibit 6 and Exhib-

it 6/tr to the Durand Affidavit.

Seaver advising Durand that Holt reserved all rights to seek legal redress for the damages caused by Fayard on this project. *Id.*

Negotiations continued between Holt and Fayard over the telephone and through telexes for the next few days. Ultimately, Holt relented in its opposition to publishing the autobiography and entered into an agreement with Fayard wherein Holt was granted the rights to translate the autobiography into English and publish the English translation in the United States, its territories, the Philippines and Canada (the "Holt–Fayard Agreement").[7] In addition, Holt was granted the exclusive worldwide rights to license translations of *Un Chemin D'Espoir* into languages other than French. The Holt–Fayard Agreement provided that Holt was to make an advance payment to Fayard on account of royalties of $250,000.00 in two installments: $150,000.00 upon execution of the agreement and $100,000.00 not later than December 31, 1987. In addition, Holt was to pay Fayard 85% of the proceeds of licenses granted to translate *Un Chemin D'Espoir* into languages other than French, and to supply the license agreements to Fayard. Upon execution of the Holt–Fayard Agreement, Holt paid Fayard $150,000.00, the first installment of the advance, and $12,813.53, which Holt maintained amounted to 85% of the total received by it on licenses already granted. No other payments were made to Fayard.

On November 9, 1987, Holt published an English translation of *Un Chemin D'Espoir*, under the title *A Way of Hope*. In addition, Holt licensed translations of the book into a number of other languages. Holt, however, has not paid Fayard the additional amounts specified in the Holt–Fayard Agreement. On March 14, 1988, Fayard commenced the present lawsuit against Holt.

In its first cause of action, Fayard seeks judgment awarding it $100,000, the amount of the advance Holt allegedly failed to pay

on December 31, 1987, plus interest. On its second cause of action, Fayard seeks judgment directing Holt (1) to supply Fayard with copies of license agreements, accounts of sales and copies of translations of *Un Chemin D'Espoir;* (2) to account to Fayard with respect to the licenses granted by Holt to translate the autobiography and the sums received or to be received from these licenses; and (3) to pay to Fayard all sums shown to be due pursuant to the Holt–Fayard Agreement, with interest.

Holt counters that (1) Fayard unlawfully induced Holt to enter the May 1, 1987 contract by making misrepresentations concerning: (a) the nature of the book over which they contracted, (b) Fayard's rights in the book, and (c) the date when the French version of the book would be published;[8] (2) the Holt–Fayard Agreement is unenforceable for lack of consideration because Holt already had the rights to publish the book; and (3) Holt signed the Holt–Fayard agreement under economic duress. In addition, Holt asserts that Fayard tortiously interfered with Holt's rights to publish the autobiography under the Walesa–Andrews Agreement and the Holt–Andrews Agreement, and seeks damages resulting from that interference.

## DISCUSSION

A court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

---

**7.** This agreement is annexed as Exhibit 30 to the Durand Affidavit

**8.** These allegations also form the basis for Holt's second counterclaim against Fayard for breach of contract.

242, 247–250, 106 S.Ct. 2505, 2509–2511, 91 L.Ed.2d 202 (1986)). Only if "no reasonable trier of fact could find in favor of the nonmoving party" should summary judgment be granted. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). In other words, only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted. *National Railroad Passenger Corporation v. City of New York*, 882 F.2d 710, 713 (2d Cir.1989). While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and defenses, and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co.*, *supra*, 804 F.2d at 12. The motion then:

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

Once the moving party has demonstrated the absence of any genuine issue of material fact, the non-moving party must establish " 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Rule 56(e), Fed. R.Civ.P.; emphasis supplied in *Matsushita* ).

■ Where the issue to be decided concerns the proper interpretation of a contract, summary judgment may be proper if the terms of the agreement are wholly unambiguous and reasonable people could not differ as to their meaning. *See United States Naval Institute v. Charter Communications, Inc.*, 875 F.2d 1044, 1048 (2d Cir.1989); *Wards Co., Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir.1985).

## A. Holt's Rights to Publish Walesa's Autobiography

■ Initially, the Court examines Holt's claim that it continued to have the exclusive contractual rights to publish Walesa's autobiography in May 1987 when it entered into the Holt–Fayard Agreement. Holt contends that under the terms of the Walesa–Andrews and Holt–Andrews Agreements, it maintained the exclusive rights to publish the autobiography regardless of the expiration of the stated time limitations on Andrews' rights in the Walesa–Andrews and Modification Agreements. In support of this assertion, Holt argues that once Andrews' entered into the publishing contract with it, Walesa was under a duty to perform the Walesa–Andrews Agreement by producing the manuscript for the autobiography. Holt maintains that Walesa's failure to provide Holt with this manuscript was the "nonoccurrence of a condition" which abrogated the time limitations on Andrews' exclusive rights to the autobiography. Because it could not publish a book that did not yet exist, Holt argues that its rights to publish the autobiography could not legally expire prior to production of the manuscript, regardless of any contractual time limitations.

The unambiguous language of the Walesa–Andrews and Holt–Andrews Agree-

ments undermines Holt's argument. The rights to the autobiography which Holt contracted for with Andrews were necessarily those rights, and only those rights, which Andrews possessed. The Holt–Andrews Agreement expressly recognizes this limitation as it provides that it is "predicated" on the existence of the Walesa–Andrews Agreement. The language of the latter agreement is clear that the exclusive rights granted to Andrews regarding the publication of an autobiography would expire if the book was not published within the time period identified in the contract. The Walesa–Andrews Agreement, which does acknowledge the problems faced by the parties in creating a manuscript, does not provide for an extension of Andrews' exclusive rights in the event those problems delay the production of the manuscript. Holt's attempt to eliminate the express time limitation on Andrews' rights in the Walesa–Andrews Agreement is unfounded.

The Walesa–Andrews Agreement contained an initial six-month time limitation, with the proviso that once a commitment was made with a publisher, the "rights previously granted shall be extended for a period of one year to permit completion of the ... publication." At most, this one year extension would have resulted in Andrews' retaining the exclusive rights to the autobiography for eighteen months from April 10, 1984, or until October 10, 1985.[9] The Modification Agreement apparently extended Andrews' rights until December 31, 1985. Holt, however, contends that the Modification Agreement had no effect on the book arrangement, and only modified the motion picture aspects of the Walesa–Andrews Agreement. What is clear from these arguments is that Andrews' exclusive rights to publish Walesa's autobiography ran out, at the latest, by the end of December 1985. Therefore, Holt had no contractual rights to publish the book when it entered into the Holt–Fayard Agreement.

Moreover, Holt's argument that its right to publish the autobiography continued un-

til a manuscript was furnished to it is belied by the express terms of the Holt–Andrews Agreement. This agreement provided for delivery of the manuscript by September 1, 1985, and stated that "[t]he provisions as to content and form of the [autobiography] are material terms of this agreement, and the time of delivery of such manuscript shall be of the essence." Exhibit C, annexed to the Macrae Affidavit, at ¶ 4. In the event the manuscript was not timely delivered, Holt's obligations under the contract were not suspended. Instead, Holt was entitled to be reimbursed for all of the funds it had advanced, within thirty days. Accordingly, Holt was protected from a delay in the production of the manuscript which would extend beyond the termination of Andrews' rights to publish the autobiography. The possibility of delay was readily foreseeable given the tumultuous political situation in Poland, and Holt wisely contracted for this contingency. Whatever the contractual claims Holt might have against Andrews or Walesa for their alleged failure to abide by the terms of the Holt–Andrews or Walesa–Andrews Agreements, the time limitations upon Andrews' exclusive rights to the autobiography were unaffected, and Holt did not continue to have the exclusive rights to publish the autobiography at the start of 1986.

In addition, Holt now puts forth the argument that it had legally cognizable rights to publish the autobiography based solely on an oral agreement between Walesa and Macrae in June 1984. Holt argues that in reliance on its oral understanding with Walesa that it had the exclusive rights to publish his autobiography, Holt advanced money to Andrews, invested additional time and effort into the project, and negotiated agreements with other publishers to translate and distribute the autobiography worldwide. Therefore, Holt insists, it has legally enforceable rights to publish the autobiography based on a theory of promissory estoppel. *See, e.g. Restatement Second of Contracts* § 90.

---

**9.** Fayard argues that the one year extension is to be calculated from the date Andrews secured a commitment with a publisher, or July 1984, and

that the rights therefore would have expired in July 1985.

There is no substance to this contention. Holt's own actions in entering into the Holt–Andrews Agreement after the 1984 meetings with Walesa clearly dispel any doubts that Holt considered itself to have a direct contract with Walesa. The entire Holt–Andrews Agreement was predicated on Holt's recognition that Andrews held the exclusive rights to Walesa's autobiography. All of the actions Holt allegedly took in reliance on the direct contract with Walesa are entirely consistent with the terms of the Holt–Andrews Agreement. Accordingly, there is no support for finding a direct agreement existed between Holt and Walesa which would not be subject to the time limitations of the Walesa–Andrews Agreement.

Holt's counterclaim against Fayard for tortious interference with its contract to publish Walesa's autobiography must, therefore, be dismissed. The facts presented to the Court indicate that Fayard was first contacted regarding the possibility of publishing the Walesa autobiography in 1986, after Holt's rights had expired. To maintain a claim for tortious interference with a contract, Holt must allege (1) the existence of a valid contract granting Holt the right to publish the autobiography, (2) Fayard's knowledge of that contract, (3) Fayard's intentional procuring of a breach of that contract by Andrews or Walesa, and (4) damages to Holt. *See Resnick v. Resnick,* 722 F.Supp. 27 (S.D.N.Y.1989); *Walters v. Fullwood,* 675 F.Supp. 155, 159 (S.D.N.Y.1987); *Demalco Ltd. v. Feltner,* 588 F.Supp. 1277, 1280 (S.D.N.Y.1984) (additionally, a plaintiff must allege that but for the interference by defendant the contract would have been performed). Because there is no basis for concluding that Holt continued to have a valid contract to publish the autobiography in 1986, no claim against Fayard for tortious interference with this contract can be maintained. Ac-

cordingly, this counterclaim must be dismissed.

B. *The Validity of the Holt–Fayard Agreement:*

■ Holt, in its answer, asserts that it was induced to enter into the Holt–Fayard Agreement due to Fayard's misrepresentations. Holt has not continued to argue this point in its motion papers. It is undisputed that prior to executing the Holt–Fayard Agreement, Holt knew of the nature of the manuscript, in fact, Holt strenuously objected to the content of the manuscript *before* signing the agreement. In addition, Holt had previously asserted that it held rights to the autobiography superior to Fayard's, and had even threatened legal action to enforce these rights prior to entering into the contract with Fayard. Finally, Holt clearly knew that *Un Chemin D'Espoir* had already been published by Fayard on April 22, 1987. Holt objected to this publication date, yet still entered into the Holt–Fayard Agreement. Because Holt knew the facts surrounding the alleged misrepresentations prior to signing the contract, it cannot use these misrepresentations as a basis to avoid the contractual obligations it nonetheless chose to undertake.

Similarly, it is undisputed that Holt, cognizant of the alleged inferiority of the French manuscript, aware of the April publication date of *Un Chemin D'Espoir,* and vocal in its position that it had legally superior rights to publish Walesa's autobiography, nevertheless entered into the Holt–Fayard Agreement and continued to reap the benefits of this agreement by publishing an English translation of the book and licensing translations into other languages. None of the facts known prior to the execution of the Holt–Fayard Agreement can form a basis for asserting Fayard breached that agreement.[10]

**10.** Holt argues that the extent of the deficiencies in the manuscript were not clear prior to May 1, 1987, nor were the financial consequences of the early publication of *Un Chemin D'Espoir.* Holt's own statements prior to signing the contract, however, clearly contradict this assertion. Holt, which had the manuscript in its posses-

sion, expressed these objections prior to entering into the agreement because it felt the commercial success of the project was threatened. According to Holt, its concerns proved to be accurate and the Walesa autobiography was not as successful as it might have been. Disregarding its own warnings, which evidence knowl-

Holt next argues that the Holt–Fayard Agreement is not valid because it lacked consideration. This argument is premised on the assumption that Holt maintained the legal rights to publish Walesa's autobiography into 1986. Even if Holt had such contractual rights, however, consideration for the Holt–Fayard Agreement would exist because it was the outcome of negotiations wherein both parties settled their competing claims to publish the book. It is axiomatic that the good faith settlement of a claim is adequate consideration. *E.g. Corbin on Contracts* §§ 139–140 (1963).

Holt further argues that the Holt–Fayard Agreement is unenforceable because it was signed under economic duress. In the spring of 1987, Holt had entered into contracts with at least seven other publishers to deliver the Walesa manuscript, and had collected advance payments from these publishers. Holt feared that if it failed to deliver the manuscript its reputation and ability to conduct future business with these publishers would be damaged. Holt also worried that it would be required to return the advance payments it had received. Therefore, Holt claims it had no choice but to negotiate with Fayard so that it would not have to breach its alleged agreements with its foreign sublicensees. Legal action against Fayard for tortious interference with Holt's asserted contractual rights was not pursued, Holt claims, because any lawsuit would have delayed publication of the autobiography and thereby reduced the profits to be reaped from its publishing.

The economic duress argument must be rejected as well. Notwithstanding Holt's assertions of economic duress, "a contract entered into under duress is generally considered not void, but merely voidable, and one who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it." *Scientific Holding Co., Ltd. v. Plessey Inc.*, 510 F.2d 15, 23 (2d Cir.1974).

Holt has not pointed the Court to any action it took to repudiate the agreement prior to the filing of the lawsuit by Fayard. At best, it appears that the first sign of Holt's intention not to be bound by the Holt–Fayard Agreement was its failure to pay the advance required on December 31, 1987. Holt's failure to timely raise its claim for economic duress after it had possession of the manuscript, and even after it had published its own English translation of the autobiography, constitutes an affirmance of the Holt–Fayard Agreement.

## CONCLUSION

Fayard's motion for summary judgment is granted. Holt is directed to pay Fayard the advance sums due under the Holt–Fayard Agreement and provide an accounting to Fayard concerning the remaining amounts due Fayard under the Holt–Fayard Agreement. Holt's counterclaims for tortious interference with contractual relations and for breach of contract are dismissed.

Settle judgment on notice.

---

edge of the potential problems, Holt entered into the Holt–Fayard Agreement. Accordingly, Holt cannot now be excused from its contractual obligations because the difficulties it predicted prior to entering into the contract were actually encountered.