**BUSINESS INCENTIVES CO., INC.,**
**Plaintiff,**

v.

**SONY CORPORATION OF AMERICA,**
**Defendant.**

**No. 75 Civ. 214.**

United States District Court,
S. D. New York.

June 4, 1975.

Nierenberg, Zeif & Weinstein, New York City, for plaintiff; by Saul I. Weinstein, New York City, of counsel.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for defendant; by Leonard H. Rubin, Charles A. Soberman, New York City, of counsel.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Defendant in this diversity breach of contract action has moved for a Rule 12(b)(6) order dismissing seven counts of the nine count complaint—or in the alternative for summary judgment on such counts—on the ground that they fail to state claims upon which relief may be granted. Plaintiff cross moves for partial summary judgment on the remaining two counts, on the ground that defendant's failure to move or answer as to these counts entitles it to judgment thereon. Defendant's motion

is granted, except as to Count VII, and Counts I–IV and VIII–IX are dismissed. Plaintiff's motion is denied, defendant's time to answer having automatically been extended by its Rule 12(b)(6) motion.

On July 12, 1965, plaintiff—a small family owned New Jersey corporation—entered into a contract with defendant Sony—a large publicly held New York corporation—whereby it agreed to interest industrial concerns located in the New York metropolitan area in the purchase, direct from Sony, of Sony electronic products for use as prizes and awards in their employee incentive and customer premium programs. Serving as an intermediary between Sony and such industrial concerns, plaintiff was, in effect, an independent salesman for SONY goods. It had been performing similar services for many other manufacturers—including several of Sony's major competitors.[1] However, plaintiff claims that by the time this lawsuit was commenced it had developed its Sony business to such an extent that 75% of its income was derived from commissions earned on the sale of SONY products alone. Under the terms of its initial agreement with Sony, plaintiff's rate of commission was set at 5% of all sales effected by it between Sony and third parties. Sony reserved the right to accept or decline orders by customers procured by plaintiff and to determine the price, terms and conditions of such sales. Their contract also had a provision entitling plaintiff to buy representative samples of Sony's products at a 15% discount, for use in soliciting customers for Sony. Finally, the contract had a termination clause, empowering either party to terminate the Agreement, on 15 days notice. That clause had no provision requiring either party to justify such termination.

Although plaintiff was in the business of soliciting orders for the products of its clients, such as Sony, there is no indication in the papers before us that its contracts with clients other than Sony were in any way similar to its arrangement with Sony. Nor is it suggested that Sony itself had entered into similar contracts with salesmen other than plaintiff.

Two years later, having successfully built up the "territory" of New York, plaintiff was told by Sony to restrict its operations to the less lucrative "territory" of New Jersey. Plaintiff was advised that unless it agreed to this change, Sony would exercise its rights under the termination clause. Accordingly, on September 1, 1967, the parties entered into an Agreement which modified and superceded the 1965 contract, by limiting plaintiff's "territory" to New Jersey. This Agreement also eliminated the 15% product discount, but left unchanged both the rate of commission and the termination clause. The complaint does not specify what percentage of plaintiff's business was devoted to Sony at this juncture. On March 22, 1972, this second Agreement was modified, again at Sony's insistence, by a downward revision of the commission rate schedule. Subsequently, by letter dated November 2, 1973, Sony elected, in accordance with the termination clause, to terminate the Agreement, effective December 31, 1973.

On January 17, 1975, plaintiff commenced the instant action for damages arising out of what it claims to have been the unlawful termination of its contract, and for recovery of allegedly earned but unpaid commissions. Plaintiff's contention is that by virtue of Sony's disproportionately superior bargaining position, it was able to and did dictate to plaintiff grossly unfair conditions. But for this allegedly coercive situation, plaintiff contends, it would have never agreed to a contractual clause providing for termination regardless of cause. Nor would it have agreed to any downward revision of its commission rate. Sony's response to this contention is that plaintiff voluntarily en-

---

1. General Electric, Magnavox, Brother and Craig, to name a few.

tered into the Agreement with it, knowing full well that *either* party could terminate the relationship without cause; that plaintiff was not then at its mercy, as it already had many other product lines which it sold and could develop; and that, despite the existence of these other income producing opportunities, plaintiff chose to concentrate its efforts on the build-up of its business with Sony—because that seemed (and proved) to be the most economically advantageous to plaintiff.

Since Sony's motion to dismiss addresses itself to the complaint on a count by count basis, we shall briefly summarize the several counts. Plaintiff requests the following relief:

Count I. Damages for Sony's unilateral act of reducing plaintiff's commission by alleged threats of "economic duress". (Adopting principles of notice pleading, this count will be interpreted to claim any relief obtainable at common law).

Count II. Damages for Sony's unilateral reduction of commissions, on the ground that under the New Jersey Franchise Practices Act (N.J.S.A. 56:10–1 *et seq.*), the 1967 Agreement between the parties constitutes a "franchise" within the meaning of the Act and plaintiff is therefore entitled to the protection afforded by the Act.

Count III. Damages for Sony's unilateral act of cancelling the Agreement without cause, allegedly due to the "economic duress" referred to in the first Count.

Count IV: Damages for Sony's unilateral act of cancelling the Agreement without cause in violation of the N.J. Franchise Practices Act.

Count V: [Not subject of this motion] Damages for commissions earned on orders placed by customers procured by plaintiff prior to December 31, 1973 but shipped after that date.

Count VI: [Not subject of this motion] Damages for failure to ship orders promptly during the term of the Agreement.

Count VII: Damages for failure to make available to plaintiff's president a trip on an African safari allegedly earned by plaintiff as a bonus.

Count VIII: Commissions on orders placed after December 31, 1973 by customers procured by plaintiff who had set up programs utilizing Sony's products prior to the termination of the Agreement on December 31, 1973.

Count IX: Commissions for sales subsequent to December 31, 1973 to customers procured by plaintiff who had previously purchased Sony products prior to that date.

As can be seen, plaintiff's claims fall into three general categories. The first, set forth in Counts I and III, rests on a theory of "economic duress". The second (Counts II and IV) seeks the same relief as the first, but under the New Jersey Franchise Practices Act. The final category (Counts V–IX) seeks varied relief on straight breach of contract theories.

Preliminarily, we must decide which law applies—that of New York or that of New Jersey. The problem arises because although the Tenth Paragraph of the parties' Agreement specifically provides that the Agreement "shall be governed by the laws of the State of New York", plaintiff's second category of Counts (II and IV) seeks relief under a New Jersey statute. And the first category of Counts (I and III) can be construed as claiming relief in a common law area where New Jersey has expressed a strong public policy. With respect to the statutory claim, if we should determine that the Act in question does indeed govern the parties' relationship, there is no doubt that plaintiff would have a claim for damages for Sony's re-

duction of the commission rate[2] and its termination of the Agreement without just cause.[3]

■ In general, courts will ordinarily honor contractual choice of law provisions, as long as the state selected has sufficient contacts with the transaction in question and the application of that state's law would not be contrary to any fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue at bar, and which would be the state of the applicable law in the absence of an effective choice of law by the parties. Restatement 2d, Conflict of Laws, § 187. Despite the provision in the parties' Agreement that New York law would apply, it appears that, under the above test, New Jersey law should govern instead. The only contacts with New York are that defendant is a New York corporation and the original 1965 contract provided for performance in the New York metropolitan area. New Jersey, on the other hand, would seem to have a materially greater interest in the application of its law by virtue of the fact that plaintiff is a New Jersey corporation, that the performance of the contract now in issue (executed in 1967 and modified in 1972) contemplated performance exclusively in New Jersey, and, most importantly, that New Jersey has a strong public policy—enunciated both by its courts and its legislature—in favor of protecting the relatively powerless consumer or small businessman from more powerful commercial giants, such as automobile manufacturers, oil companies, and, presumably, electronics manufacturers. See *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358, 161 A.2d 69, *Shell Oil Company* v. *Marinello* (1973) 63 N.J. 402, 307 A.2d 598. In light of the foregoing, there is no doubt but that New Jersey law should apply, despite the parties' agreement to the contrary.

The question, then, is whether the portions of plaintiff's complaint here under attack make out a claim cognizable under New Jersey's statutory or common law. We shall first discuss the statute involved, N.J.S.A. 56:10-1 *et seq.* As to the common law problem, we shall discuss it in two aspects: (a) the possibilities of a claim under the doctrine concerning adhesion contracts, as to which New Jersey courts have taken a pioneering leadership; and (b) the possibilities of a claim under the somewhat related doctrine of economic duress, as to which New Jersey seems to have no peculiar common law of its own.

## I.

■ Before plaintiff can look to the provisions of the New Jersey Franchise Practices Act for protection, the relationship between the parties must constitute a "franchise" within the meaning of the Act. Section 3 of the Act defines a franchise as

" . . . a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise."

Nowhere in the Agreement between the parties does Sony grant plaintiff a license to use its trade name or anything else. It merely agreed to allow plaintiff to attempt to convince potential customers in a limited geographical area to purchase SONY products as part of their premium or incentive programs, and to pay plaintiff a commission on completed purchases. In order to convince potential customers to purchase Sony's products, plaintiff of course used the name SONY, but it did so in the same manner as any manufacturer's

---

2. See N.J.S.A. 56:10-7(c) and (e).

3. See N.J.S.A. 56:10-5.

salesman would do and not as a franchisee. Indeed, plaintiff performed the same function for over 45 other manufacturers.

Moreover, even if we were to conclude that the arrangement between the parties was a franchise, the Act would still not apply. The Act specifically limits its application to franchise arrangements which have *all* of the following three characteristics (56:10-4):

> (i) the expectation or requirement that the franchisee establish or maintain a "place of business" within the State of New Jersey,

> (ii) gross sales of products between the franchisor and franchisee exceeding $35,000 for the 12 months preceding the institution of suit pursuant to the Act, and

> (iii) more than 20% of the franchisee's gross sales are intended to be or are derived from the franchise.

As a matter of law, the parties' relationship clearly does not qualify for protection under the Act under at least (ii) and (iii) above. Because of the nature of their contractual relationship, there were no sales between plaintiff and Sony as required by (ii) above. The sales that were consummated were between Sony and various third parties procured by plaintiff. Since there were no "sales" by Sony to plaintiff, by definition, characteristic (iii) above also was not met. In addition, it may not even meet the first condition either, although its eligibility under that condition does give rise to questions of fact. The term "place of business" is defined in § 56:10-3 of the Act as

> ". . . a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods . . . . Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle."

The Agreement itself makes no mention of where plaintiff was to maintain its place of business, and in fact, lists its office address as being in New York City. Sony contends rather persuasively that the parties did not contemplate plaintiff's maintaining a "place of business" in New Jersey and that although plaintiff did maintain an office within that State as a home base for its salesmen, such office was not a showroom where it displayed Sony's products for sale. Plaintiff does not really respond to this contention, except to say, somewhat ingenuously, that its place of business had to be New Jersey since that was its allotted territory. No attempt is made, either by legal argument or the offer of documentary proof, to establish that plaintiff's "place of business" is in New Jersey, within the meaning of the Act.

## II.

Plaintiff, apparently conceding these weaknesses in its case under the statute itself, makes the argument that it is protected nevertheless under the common law of New Jersey, first expressed in *Henningsen* v. *Bloomfield Motors, Inc.*, *supra*, 32 N.J. 358, 161 A.2d 67. This was a personal injury case involving a defective automobile where the automobile manufacturer and dealer defendants sought to avoid liability for breach of the implied warranty of merchantability by means of a written disclaimer incorporated in plaintiffs' purchase order. The court noted that this disclaimer appeared in every automobile purchase order, regardless of the manufacturer. As a result, the consumer was in no position to bargain with the dealer by threatening to go to his competitor: he would be presented with the self-same standardized mass contract with the identical disclaimer. Moreover, in the purchase of an item as large and complex as an automobile, the consumer has neither the opportunity nor the capacity to inspect his purchase for possible defects. He must rely on the inspection by the manufacturer. As dangerous an instrumentality as an automobile is—especially when it is defective—the con-

sumer is forced to agree to the manufacturer's disclaimer of certain warranties as a condition to purchase. Since all car dealers and manufacturers use the same standardized contracts, they literally dictate the terms of sale to their purchasers, who are not permitted to bargain at all. Concluding that where there is such grossly disproportionate bargaining power the principle of freedom to contract is non-existent, the court invalidated as against public policy the disclaimer because it was "so inimical to the public good". *Id.*, 161 A.2d at 95.

◼ The only similarity between *Henningsen* and the case at bar is the fact of possible unequal bargaining power. Unlike the plaintiff in *Henningsen*, however, our plaintiff was not forced to accept a standardized mass contract. It was free to—and in fact did—deal with Sony's competitors. There are no allegations in the complaint that plaintiff's other clients used the same contract as Sony, nor does plaintiff contend that Sony had the same contract with its other salesmen. Moreover, there is no allegation that the terms of Sony's contract injured the public in any way—a crucial element in the *Henningsen* case. Nor can we imagine such an injury to the public.[4]

### III.

◼ Similarly, plaintiff can find no refuge in the doctrine of economic duress. Under this doctrine, courts will not enforce an agreement in which one party has "unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury". *Nixon* v. *Leitman* (1962) 32 Misc.2d 461, 224 N.Y.S.2d 448, 452. A contract is voidable on the ground of du-

ress when it is established that the party making the claim was forced to agree to it "by means of a wrongful threat precluding the exercise of his free will". *Austin Instrument, Inc.* v. *Loral Corp.* (1971) 29 N.Y.2d 124, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533. The threat must be wrongful; if the defendant's actions are within his legal rights, plaintiff can not make out a claim of economic duress and the courts will not intervene to void a contract fair on its face. Mere hard bargaining positions, if lawful, and the press of financial circumstances, not caused by the defendant, will not be deemed duress. The alleged duress must be proven to have been the result of defendant's conduct and not of the plaintiff's own necessities. *Fruhauf Southwest Garment Co.* v. *United States* (1953) 111 F.Supp. 945, 951, 126 Ct.Cl. 51, 62. In addition to this requirement that the press of circumstances be the result of the defendant's coercive acts, the *Fruhauf* court noted two other prerequisites to a finding of economic duress: (1) that plaintiff involuntarily accepted the terms offered by defendant and (2) that the circumstances permitted no other alternative.

◼ It seems clear that the complaint alleges no cause of action under this theory. The critical clause—giving either party the right to terminate without cause—was in the original contract executed in July of 1965. That clause was obviously a protection to both parties should plaintiff be unsuccessful in its efforts to establish a market for Sony, but could only benefit Sony in the event of plaintiff's success. Everything that happened thereafter was the result of Sony's exercise of its legal rights under that clause. Plaintiff alleges no facts to

---

4. Plaintiff also places much reliance on *Shell Oil Company* v. *Marinello, supra*, 63 N.J. 402, 307 A.2d 598, a decision in which the New Jersey Supreme Court held that despite the nonretroactivity of the New Jersey Franchise Practices Act, a franchise agreement which antedated the Act would still be governed by the principles codified therein. More specifically, the Court noted that the prior public policy of New Jersey was to restrict the unilateral right of a franchisor to terminate its franchise agreement with its franchisee to a situation where "good cause" for such action exists. *Id.* (See also *Texaco, Inc.* v. *Appleget* (1973) 63 N.J. 411, 307 A.2d 603. However, while there was no question in *Shell* that the relationship between the oil company plaintiff and service station operator defendant was that of a franchise, we have already concluded that such was not the case in the situation at bar.

suggest that it was in an inferior bargaining position at the time such clause was first agreed to.[5] On the contrary, it would seem that plaintiff was then in a position to offer a certain expertise of which it convinced Sony that it had a need. If, in such circumstances, it entered into an unwise bargain with Sony, the courts can give it no relief. *Fruhauf Southwest Garment Co.* v. *United States, supra.* Nor will Sony's use, however selfish, of legal rights flowing from such bargain be characterized as duress.[6] *Mobil Oil Corp.* v. *Lione* (Dist.Ct., Suffolk, 3d Dist. 1971) 66 Misc.2d 599, 322 N.Y.S.2d 82, *Nixon* v. *Leitman, supra.*

### IV.

 Finally, as to the last category of counts, which assert straight breach of contract claims concerning allegedly earned but unpaid commissions, Sony argues that since its termination of the Agreement was lawful, any sales consummated after the effective termination date cannot be counted toward the computation of plaintiff's commissions. We must agree. Plaintiff has no right to commissions on sales effected after termination, which, by the very terms of the Agreement,[7] are excluded from consideration. As a result, Counts VIII and IX—which seek commissions on orders placed after termination—must be dismissed.

The same is not true, however, with respect to Count VII, which alleges that by virtue of the number of sales effected *prior* to the termination date, plaintiff is entitled to the promised bonus of an African safari or the equivalent value thereof.[8]

To recapitulate, for the reasons stated above, defendant's motion to dismiss Counts I–IV and VII–IX is granted in part and denied in part as follows:

| Count I | — | granted |
|---|---|---|
| II | — | granted |
| III | — | granted |
| IV | — | granted |
| VII | — | denied |
| VIII | — | granted |
| IX | — | granted |

So ordered.

---

5. Indeed, although perhaps irrelevant, plaintiff alleges no facts to suggest that it had lost its bargaining position the first time Sony availed itself of the termination clause by excluding plaintiff from the New York metropolitan area market and confining it to New Jersey.

6. *Cf.* the "extortionate demand" cases: *Austin Instrument, Inc.* v. *Loral Corp., supra* (after contractor entered into prime contract with Navy requiring component parts that it could not obtain from any source other than its subcontractor, said subcontractor threatened to cut off the supply of such parts unless contractor awarded it another, unrelated subcontract) and *Van Dyke* v. *Wood* (1st Dept. 1901) 60 App.Div. 208, 70 N.Y.S. 324· (wife refused to release her dower right in piece of husband's property so that he could sell it to avoid imminent foreclosure, despite her earlier agreement to release said rights in exchange for conveyance of another piece of property valued at $300,000, unless he conveyed to her an additional piece of property).

7. Paragraph SEVENTH clearly excludes commissions on orders placed *after* the termination date by stating that:

"Following the effective date of termination of this Agreement, commissions shall be paid only on shipments of products . . ., made by the Company, to PRE-MIUM USAGE customers . . . in such instances where the sales shall have been directly effected by the Sales Representative *and where the Purchase Orders shall have been received and accepted prior to the effective date of termination.*" (emphasis added)

8. In addition to asserting that plaintiff sold sufficient Sony merchandise to qualify for the safari, plaintiff, in the alternative, alleges that it "would have" sold such merchandise "but for the acts of defendant". If the "acts of defendant" thus referred to constitute no more than the exercise of defendant's lawful rights under the termination clause, they would not support any claim for relief. For present purposes, however, we shall assume that plaintiff is alleging some other conduct which would invoke the doctrine that the frustration of the happening of a condition precedent may be a breach of contract in and of itself. Restatement of Contracts § 315.