**U S WEST FINANCIAL SERVICES, INC., Plaintiff,**

v.

**Stanley S. TOLLMAN and Monty D. Hundley, Defendants.**

**No. 90 Civ. 6745 (MBM).**

United States District Court, S.D. New York.

Feb. 28, 1992.

Joel M. Miller, Charles R. Jacob III, James P. Rosenzweig, Miller & Wrubel P.C., New York City, for plaintiff.

Philip S. Kaufman, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff, US West Financial Services, Inc., moves for summary judgment on a guaranty executed by defendants Stanley S. Tollman and Monty D. Hundley (the "Guaranty"), and to dismiss defendants' counterclaims and affirmative defenses. For the reasons set forth below, plaintiff's motion is granted.

## I.

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam) (cited in *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987)). Therefore, for current purposes, I must assume that the facts set forth in defendants' submissions are true.

Defendants are principals of Tollman–Hundley Hotels, an organization that owns, operates and franchises hotels in the United States and abroad. Tollman–Hundley and US West, a Colorado corporation, have a longstanding business relationship and, over the last 5 years, have "negotiated, documented and implemented many loan transactions." (Tollman Aff. ¶ 3)

In 1985, defendants organized a limited partnership, Days One, Ltd., for the purpose of acquiring six Days Inn hotels in California and a Days Lodge in Florida. Interests in the Days One limited partnership were syndicated to approximately 70 individual investors who paid for their interests with a combination of cash and notes. The general partners were defendant Hundley and a Florida corporation, Days 666 Corp., whose principals were Harvey Martin and Martin Rosen, partners in the accounting firm of Martin Rosen & Co. (Tollman Aff. ¶ 4)

In early 1986, US West's predecessor made three separate loans to Tollman–Hundley entities, secured by Tollman–Hundley's right, title and interest in the Days One individual investor notes. The Loan Agreements established a payment schedule structured to allow Tollman–Hundley to use the individual investors' payments to amortize the US West loans. Each year, the individual investors would remit payment by May 1 and Tollman–Hundley would use the funds to cover its obligations to US West on June 1. At the time of the events giving rise to this litigation, there were two payments remaining on Tollman–Hundley's US West loans, those due June 1, 1989 and June 1, 1990. (Tollman Aff. ¶ 6)

In early 1989, Tollman–Hundley and Security Pacific National Bank were negotiating a major refinancing of the Tollman–Hundley hotel properties. As collateral for a proposed $129 million bond issue, Security Pacific required that Tollman–Hundley pledge its premium properties including some of those held by Days One. In order to pledge the Days One properties, Tollman–Hundley had to buy the ownership interests of the individual investors and pay off the US West loans which, at the time, had an approximate balance of $7.9 million. (Tollman Aff. ¶ 8) As a result, Tollman–Hundley turned to US West to discuss a new loan, the proceeds of which would be used to purchase the individual investors' partnership interests and to pay off the existing indebtedness. Eventually, defendants and US West reached a preliminary agreement whereby the existing loans would be restructured and US West would provide Tollman–Hundley with over $15 million in additional financing secured by Tollman–Hundley's interest in a Days Inn located on West 57th Street in Manhattan. (Tollman Aff. ¶ 10)

Although Tollman–Hundley was encouraged by the progress of the US West negotiations, it needed a firm commitment in order to proceed with the Security Pacific refinancing. In or about March 1989, defendants and Sanford Freedman, Tollman–Hundley's Executive Vice–President and Counsel, met with James W. Connor, a senior officer of US West, to discuss the proposed transaction. According to defendants, at the meeting they informed Connor that Tollman–Hundley was prepared to instruct the individual investors not to

make their May 1 payments because of the forthcoming repurchase of the notes. In response, Connor unequivocally agreed to lend Tollman–Hundley over $15 million secured by Tollman–Hundley's subleasehold interest in the 57th Street property. (Tollman Aff. ¶ 11) There was also agreement on how the proceeds would be allocated: $7.9 million for the Days One buy-out; $3.5 million for renovation of the 57th Street property; and the remainder for general Tollman–Hundley purposes. According to defendant Tollman, Connor stated that closing would occur by June 30, 1989, and that the existing loans would be treated as follows: the June 1, 1989 payment would be deferred and the June 1, 1990 payment would be accelerated to whatever date the additional funds became available. Tollman asserts that he again told Connor that in reliance on US West's commitment, Tollman–Hundley would tell the individual investors to defer their May 1, 1989 payments. (Tollman Aff. ¶ 12)

According to Tollman, he then instructed Harvey Martin of Martin Rosen & Co., to advise the individual investors that Tollman–Hundley was negotiating an extension of the May 1 payment in connection with a purchase of the individual partnership interests. In a letter dated April 7, 1989, Martin informed the individual investors:

> Your Fourth Installment Investor Note is due May 1, 1989. The general partners, Tollman Hundley Hotels, are negotiating an extension of that payment to enable them time to effectuate the purchase from us of our limited partnership interests. They expect to receive that extension soon.
>
> [Martin Rosen & Co.] will notify you of the results of all future negotiations. You will hear from us well before the May 1 due date.

(Pltf.Exh. 111) A June 13, 1989 letter from defendant Hundley to the investors, stated only that an "extension" of their payments had been arranged. (Pltf.Exh. 113) In his deposition, Martin testified:

> There was no doubt in my mind that the investors should not make the payment because it was imminent that Tollman–Hundley was going to make that payment.
>
> *   *   *   *   *   *
>
> I was positive they were going to get the extension, get the money financed and do the deal.

(Martin Dep. pp. 21–22) However, Martin further testified that prior to August 31, 1989, the date of the restructuring, he never told the investors that they were relieved of their obligation to make the 1989 payment; nor did he instruct anyone else to do so. (Martin Dep. pp. 31–32, 95) In any event, all investors save one did not make their May 1 payments, and that investor's check was returned. (Tollman Aff. ¶ 14)

According to defendants, once the May 1 payment date passed, US West suddenly imposed new conditions on the 57th Street loan and the restructuring. Defendants were told for the first time that US West headquarters would not approve use of the loan proceeds to buy the individual investors' interests. The US West representatives, therefore, asked Tollman–Hundley to send them a letter falsely stating that the two transactions—the buy-out and the 57th Street financing—were distinct, and that the funds for the buy-out would come from sources other than US West. Tollman–Hundley then would be free to use the proceeds as it wished, including to finance the buy-out. In addition to a restructuring fee and a letter of credit, US West also required for the first time that Tollman and Hundley personally guarantee the remaining payments on the existing US West loans. According to defendants, US West threatened that if Tollman–Hundley refused to comply with these demands, not only would the promised additional financing be withheld, thereby preventing purchase of the partnership interests and undoing the Security Pacific transaction, but also the individual investors would be sued for default on the May 1 payments. (Zuckerman Aff. ¶¶ 3, 4; Tollman Aff. ¶ 15)

As the June 1, 1989 payment date approached, it became evident that without the funds from the individual investors, Tollman–Hundley would be unable to make the June 1 payment on the existing US

West loans. As a result, US West again threatened to sue the individual investors, which defendants concede it had a right to do pursuant to the Loan Agreements. However, Tollman contends that such a suit would have caused the investors to sue Tollman–Hundley for breach of fiduciary duty and misrepresentation, triggering default provisions in other Tollman–Hundley notes and placing the entire organization in jeopardy. Tollman and Hundley, therefore, acceded to US West's demands and allowed US West to dictate the terms of the restructuring and the 57th Street loan agreement. Defendants allege that US West coerced them into signing documents which suggest that they executed the Guaranty as consideration for US West's agreement to postpone the June 1, 1989 payment and accelerate the June 1, 1990 payment on the existing loans, but do not mention that defendants agreed to this arrangement only because US West promised to provide additional financing secured by the 57th Street subleasehold interest. Defendants maintain that only because of plaintiff's unfair coercion was the 57th Street financing presented in the correspondence as a separate transaction still under negotiation.

The relevant documents consist of the following:

(1) Guaranty dated August 31, 1989, which states that defendants as guarantors, "[i]n order to induce US West ... to amend [the existing Loan Agreements] ... hereby jointly and severally, absolutely, unconditionally and irrevocably guarantee to [US West] the due and punctual payment, performance and discharge ... of all debts, obligations and liabilities of [Tollman–Hundley and Days One, Ltd.] to or held by [US West] under the Loan Agreements ..." (Compl. Exh. A)

(2) Letter from Sanford Freedman to Michael Bullen of US West dated May 15, 1989, requesting an extension of the due date of the 1989 note payments from June 1 to August 31, 1989, and the right to prepay the 1990 principal amount plus interest on August 31, 1989. In exchange, Tollman–Hundley offered to post a letter of credit in the amount of the 1989 pay-

ment as security, pay a restructuring fee, and cause defendants to execute a personal guaranty. The letter states: "We anticipate that the purchase of the limited partnership interests will take place by August 31, 1989. The funds for the purchase will be obtained from our second CMO Bond Issue, in the amount of $129,000,000, which is being handled by Security Pacific National Bank." (Pltf. Exh. TH34)

(3) Letter from Karen Vais of US West to Sanford Freedman dated June 6, 1989, accepting Tollman–Hundley's proposal as set forth in Freedman's May 15 letter. The Vais letter states that Tollman–Hundley "will provide [US West] with copies of the correspondence sent to investors notifying them of the partnership's plans and their continued obligation under their promissory notes should the projected bond offering with Security Pacific not close." (Bullen Decl. Exh. 4)

(4) Letter Agreement dated August 9, 1989, which states: "[W]e [Tollman–Hundley] ... agree that you [US West] will have no obligation whatsoever to us with respect to the proposed financing [the 57th Street loan] until a formal commitment letter is executed and delivered to us by you in accordance with the terms and conditions thereof. We understand that (a) you have no obligation to approve the proposed financing ... (b) you may decide not to proceed with the proposed financing for any reason or for no reason, and (c) you will have no obligation or liability whatsoever to us for any costs, expenses, obligations or liabilities incurred by us in connection with the proposed financing." (Bullen Decl. Exh. 17)

(5) Letter from Howard Zuckerman of Tollman–Hundley to Michael Bullen of US West dated August 31, 1989, stating that "the financing of Days Inn at 57th Street in Manhattan will be completed by one of three institutions [not including US West] within the next 45 days." (Bullen Decl. Exh. 18)

(6) Amendment to the Loan Agreement dated August 31, 1989, which provides that US West agreed to allow defendants to defer the June 1, 1989 payment to October

2, 1989, and to accelerate the June 1, 1990 payment to the same date, in exchange for a letter of credit and defendants' personal guaranty. (Bullen Decl. Exh. 6)

(7) An Opinion Letter from Sanford Freedman to US West dated August 31, 1989, stating that defendants were competent at the time they signed the Guaranty and Loan Agreement, and that each document is a "legal, valid and binding obligation[ ]." (Bullen Decl. Exh. 8)

The West 57th Street financing was never consummated, and under the amendments to the loan agreements, signed August 31, 1989, payment of the outstanding balance on the existing loans was due on October 2, 1989. (Bullen Decl. Exh. 6) That payment was never made, and the loans are in default. Plaintiff sues to enforce the terms of the Guaranty, seeking $1,763,-668.85 plus $744.48 per day for each day after September 28, 1990, and all expenses incurred in enforcement of the Guaranty. Defendants argue that US West's demands following May 1, 1989 amounted to economic duress and, therefore, the formal loan documentation that creates the appearance that the 57th Street financing and the buy-out of the individual investors were separate transactions, including the Guaranty, should be ignored. Defendants contend that faced with the threat of default on the June 1, 1989 payment, they were coerced into accepting US West's terms. They also have asserted a variety of counterclaims which are discussed below.

## II.

### A. *Economic Duress*

■ In order to prove that the Guaranty was executed under economic duress, defendants must establish that there was: (1) a threat, (2) unlawfully made, (3) which caused involuntary acceptance of contractual terms, (4) because the circumstances permitted no alternative. *Gulf & Western Corp. v. Craftique Productions, Inc.*, 523 F.Supp. 603, 610 (S.D.N.Y.1981); *Business Incentives Co. v. Sony Corp. of America*, 397 F.Supp. 63 (S.D.N.Y.1975) (and cases cited therein). Plaintiff argues that defendant cannot establish (1) that US West

made an unlawful threat, and (2) that circumstances permitted no alternative source of financing.

The basis of the economic duress defense is plaintiff's alleged threats to breach the oral financing agreement and to sue the individual investors. Plaintiff argues that because it had a right under the existing Loan Agreements to sue the Days One investors for the May 1, 1989 payment, any threat to do so was not unlawful. Defendants concede that under normal circumstances US West would have had this right, since the investors were in default, but argue that in this case, because US West had induced the default by agreeing to provide defendants with additional financing, it was estopped to breach the financing agreement, declare a default, or sue the investors for nonpayment. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 88 F.R.D. 38, 43 (S.D.N.Y.1980).

■ The circumstances in which a threat to pursue an otherwise lawful action constitutes economic duress were summarized by Judge Goettel in *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 644 (S.D.N.Y.1978), *aff'd* 597 F.2d 314 (2d Cir.1979): "The wrongful act may be accomplished through lawful means, such as settlement negotiations, if they are used to trade upon the victim's poor financial condition with the improper purpose of securing personal advantage. A necessary element of the latter type of business compulsion, however, is a showing that the victim's financial straits were caused by the other party." Therefore, defendants can establish that an unlawful threat was made if they can show that plaintiff threatened to sue the investors, thereby exacerbating financial hardship caused by the plaintiff. *See Business Incentives*, 397 F.Supp. at 69.

■ In addition, defendants argue that the threat to breach the alleged oral financing agreement was unlawful. A threat to breach a contract by withholding performance can constitute economic duress, if the threatened breach will result in irreparable harm. *805 Third Ave. Co. v. M.W. Realty*

*Assoc.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 448 N.E.2d 445 (1983) ("The existence of economic duress is demonstrated by proof that one party to a contract has threatened to breach the agreement by withholding performance unless the other party agrees to some further demand."); *Neuman v. Pike*, 591 F.2d 191, 193–94 (2d Cir.1979) (In order to constitute duress, the threatened breach must give rise to irreparable injury.). Therefore, to prove that the threatened breach of the alleged oral agreement constitutes unlawful duress, defendants must show that plaintiff threatened to breach an enforceable contract, leaving defendants no adequate remedy at law. *See Sosnoff v. Carter*, 165 A.D.2d 486, 568 N.Y.S.2d 43, 46 (1st Dept.1991).

Accepting defendants' version of the events as true, it is apparent that US West's threats to sue the individual investors and breach the alleged financing agreement were motivated by a desire to induce defendants to accept certain additional terms favorable to US West. It is also apparent that Tollman–Hundley's already precarious financial condition may have been worsened by US West's threats. Although plaintiff was not responsible for the market conditions that motivated defendants to pursue the Security Pacific refinancing, US West's offer, and subsequent threatened withdrawal of the 57th Street financing, may have further destabilized Tollman–Hundley's financial condition. (Tollman Aff. ¶¶ 15—18)

Defendants, however, offer no reasonable explanation as to why they did not collect from the individual investors, thereby solving Tollman–Hundley's liquidity problem. They assert that had they attempted to collect from the individual investors, they and Tollman–Hundley would have been subjected to lawsuits which would have triggered more than $350 million in contingent liabilities. (Tollman Aff. ¶ 3) However, defendants offer nothing but speculation regarding the possible investor lawsuits. They have not submitted a single document or affidavit regarding possible claims by the Days One investors. *See Fox–Knapp, Inc. v. Employers Mut. Cas. Co.*, 725 F.Supp. 706, 708 (S.D.N.Y.) ("mere conjecture or speculation will not suffice to avoid summary judgment"), *aff'd*, 893 F.2d 14 (2d Cir.1989). In fact, defendants never told the individual investors that those investors had no obligation to make the May 1, 1989 payment. The only written communications to the Days One investors stated that their May 1 payment had been deferred, not that it had been forgiven. In Martin's letter of April 7, 1989, the investors were informed only that "Tollman–Hundley [was] negotiating an extension." (Pltf. Exh. 111) Similarly, on June 30, 1989, defendant Hundley wrote the Days One investors:

> Stanley Tollman and I have arranged for an extension of the 1989 payment due on your note issued in connection with the purchase of your interest in Days One
>
> \*    \*    \*    \*    \*    \*
>
> Of course, if a purchase is not completed by August 31, 1989, the note payments will then be due.

(Pltf. Exh. 113) Tollman asserts that he "left it to Mr. Martin to make the appropriate direct [oral] communications with the Days One investors, and he did so." (Tollman Aff. ¶ 13) However, Martin's deposition testimony shows that no such communications occurred:

Q. Prior to the time that you believe[d] the 1989 payment was made to US West, did you ever tell any of the investors that they did not have an obligation to make the May 1, 1989 payment?

A. No.

Q. Did anybody on your behalf make such a statement?

A. Not to my knowledge.

Q. Did you ever tell the investors, prior to June 30, 1989, that they had no obligation to make the [1989] payment to US West?

A. No.

(Martin Dep. pp. 31–32, 95) This testimony was confirmed by Sanford Abelson, the lead investor defendant in *US West v. Abelson*, 91 Civ. 3744 (MBM), who testified:

Q. Did Mr. Martin ever tell you, during the period leading up to August 31, 1989,

that you would never have to make the 1989 payments on your promissory note?

A. No.

(Abelson Dep. p. 14)

■ Despite defendants' conclusory assertions to the contrary, the record proves that during the relevant period, the Days One investors were not told that they were relieved of their obligation to make the May 1, 1989 payment. Thus, Tollman-Hundley had a legal right to collect these payments at any time and could have used the funds as an alternative source of financing. "Mere hard bargaining positions, if lawful, and the press of financial circumstances not caused by defendant, will not be deemed duress. The alleged duress must be proven to have been the result of defendant's conduct and not of plaintiff's own necessities." *Business Incentives*, 397 F.Supp. at 69. By not collecting from the individual investors, defendants created their own financial difficulties and therefore cannot claim that US West's threat to sue the investors was unlawfully coercive. *National American*, 448 F.Supp. at 644; *Business Incentives*, 397 F.Supp. at 69; *Weiner v. Tele King Corp.*, 123 N.Y.S.2d 101 (Sup.Ct.1953).

Similarly, defendants cannot claim that US West's threat to breach the alleged financing agreement was unlawfully coercive. Even assuming that the alleged agreement constituted an enforceable contract (*but see* III, IV, *infra*) defendants cannot establish that breach of that agreement would have left them without an adequate remedy at law. Defendants were not confronted with an immediate liquidity crisis. Instead of accepting US West's terms, they could have collected from the investors, made the June 1 payment, and sought additional financing from other sources. Any damages resulting from that course of action could have been redressed in a suit against US West for breach of contract. Therefore, defendants cannot claim that US West's refusal to honor the alleged financing agreement constituted an unlawful threat. *805 Third Ave.*, 58 N.Y.2d at 451, 461 N.Y.S.2d 778, 448

N.E.2d 445; *Sosnoff*, 568 N.Y.S.2d at 46–47.

As is evident from the above discussion, defendants have failed to show not only an unlawful threat, but also absence of a reasonable alternative. "The mere threat to breach an agreement will not constitute economic duress if the threatened party can obtain performance from some other 'source of supply'." *Sosnoff*, 568 N.Y.S.2d at 46 (citing *Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124, 130–131, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971)). Because they could have collected from the individual investors, defendants had a reasonable alternative to signing the Guaranty and cannot claim that they were coerced into accepting US West's terms. *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 131, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971).

Defendants cannot establish that an unlawful threat was made; nor can they establish that the circumstances permitted no reasonable alternative to US West's terms. Therefore, plaintiff's motion for summary judgment on the Guaranty is granted.

### B. Ratification

■ In the alternative, summary judgment is warranted because defendants ratified the Guaranty. Even if the Guaranty was entered into under duress (*but see* II–A, *supra*), that would make the contract voidable, not void. *Citibank N.A. v. Real Coffee Trading Co. N.V.*, 566 F.Supp. 1158, 1163 (S.D.N.Y.1983). " 'One who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it.' " *Fayard v. Henry Holt & Co.*, 726 F.Supp. 438, 447 (S.D.N.Y. 1989) (quoting *Scientific Holding Co., Ltd. v. Plessey, Inc.*, 510 F.2d 15, 23 (2d Cir. 1974)); *Bank Leumi Trust Co. v. D'Evori Int'l, Inc.*, 163 A.D.2d 26, 558 N.Y.S.2d 909, 914 (1st Dept.1990). The test for determining whether a party ratified a contract through acquiescence is whether the party claiming duress acted reasonably under the circumstances in asserting the claim. *See Fayard*, 726 F.Supp. at 447 (contract ratified by publisher's actions taken in accord-

ance with the contract); *Cooper v. Greenberg,* 151 A.D.2d 423, 542 N.Y.S.2d 631 (1st Dept.1989) (note allegedly signed under duress was ratified when payments were made pursuant to its terms).

Before this litigation, defendants took no action to repudiate the Guaranty; instead, they acted in accordance with its terms long after the document was executed. For instance, both Tollman and Hundley made payments pursuant to the Guaranty in late 1989. (Bullen Decl. ¶ 16) Moreover, in various written communications defendants acknowledged US West's rights under the Guaranty. In a letter dated June 11, 1990, defendant Hundley reaffirmed US West's right to proceed against defendants as Guarantors. (Bullen Decl. Exh. 11) Similarly, in a letter dated August 6, 1990, defendants offered to make their past due payments in full over eight months, and stated that "[i]f Tollman and Hundley do not make one of the payments [US West] will still have the right, at that time, to file suit against the remaining limited partners, and/or Tollman and Hundley." (Bullen Decl. Exh. 14)

Defendants' position that as "victims of the duress [they] were still operating under the fear and undue influence of the original transaction" is absurd. (Def. Mem. p. 34) As previously noted, there was an obvious alternative to both initial acceptance of plaintiff's terms and the subsequent ratification of those terms. Specifically, defendants could have tried to collect the May 1 payment from the individual Days One investors. They failed do so and instead chose to behave in a manner consistent with the terms of the Guaranty.

For that reason as well, summary judgment on the Guaranty in favor of plaintiff is warranted.

### III.

In their First Counterclaim, defendants sue US West for breach of the alleged oral agreement to provide the 57th Street financing. Plaintiff argues that the statute of frauds and the parol evidence rule bar enforcement of the alleged financing agreement.

An agreement to provide a mortgage—such as the alleged oral agreement to finance the 57th Street property—is a conveyance of an interest in real property and therefore subject to the statute of frauds. *Grimm v. Marine Midland Bank, N.A.,* 117 A.D.2d 901, 498 N.Y.S.2d 591, 592 (3d Dept.1986). New York General Obligations Law § 5–703(1) (McKinney 1989) provides, *inter alia:*

> An estate or interest in real property . . . cannot be created, granted, assigned, surrendered or declared, unless by act of operation of law, or by a deed or conveyance in writing.

Moreover, an oral contract that cannot be performed within one year, such as the alleged financing agreement, is unenforceable under N.Y.Gen.Oblig.Law § 5–701(a)(1) (McKinney 1989). *See, e.g., Zupan v. Blumberg,* 2 N.Y.2d 547, 161 N.Y.S.2d 428, 141 N.E.2d 819 (1957).

Defendants argue, however, that because plaintiff was aware that they relied on the promised financing by delaying collection of the May 1 payment, pursuing the Security Pacific financing, and not cultivating other sources of financing, plaintiff is equitably estopped to assert a statute of frauds defense. The requirements of equitable estoppel are: (1) a concealment of facts or a false misrepresentation; (2) an intention or expectation that the concealed or misrepresented facts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoer; and (4) reliance which causes an innocent party to change its position to its substantial detriment. *Margate Industries, Inc. v. Samincorp, Inc.,* 582 F.Supp. 611, 619 n. 8 (S.D.N.Y.1984); *Special Event Entertainment v. Rockefeller Center, Inc.,* 458 F.Supp. 72, 76 (S.D.N.Y.1978). "To preclude the assertion of the defense of the statute of frauds by establishment of facts sufficient to invoke the doctrine of equitable estoppel, it must be shown that representations were made by the party sought to be estopped of a nature calculated to mislead or defraud the party seeking availment of the doctrine." 61 N.Y.Jur.2d *Frauds, Statute of* § 297 (1987).

According to the affidavits submitted by defendants, US West falsely promised to go ahead with the financing, knew that defendants relied upon that promise, and subsequently repudiated that promise after defendants had placed themselves in a precarious financial situation. They claim that US West's purpose was to extort favorable terms for the restructuring and the 57th Street financing. (Tollman Aff. ¶¶ 3, 15, 16) Plaintiff responds that no misrepresentations were made, it was unforeseeable that defendants would rely on any statements that were made, and any actual reliance on the oral agreement was unreasonable; therefore, plaintiff asserts, the statute of frauds applies.

However, whether plaintiff is equitably estopped to raise the statute of frauds need not be decided because the requirement of mutual assent and the parol evidence rule mandate dismissal.

In the Letter Agreement dated August 9, 1989, Freedman wrote:

> We [Tollman–Hundley] have made the foregoing request [concerning US West's retention of counsel] notwithstanding that you have not approved the proposed financing and we agree that you will have no obligation whatsoever to us with respect to the proposed financing until a formal commitment letter is executed and delivered to us by you and accepted by us in accordance with the terms and conditions thereof. We understand that (a) you have no obligation to approve the proposed financing or to issue a commitment letter and that whether or not you chose to do so in both instances is totally within your sole discretion, (b) you may decide not to proceed with the proposed financing for any reason or for no reason, and (c) you will have no obligation or liability whatsoever to us for any costs, expenses obligations or liabilities incurred by us in connection with the proposed financing.

(Bullen Decl. Exh. 17)

■■■ "[W]hen the parties have clearly expressed an intention not to be bound until their preliminary negotiations have culminated in the execution of a formal contract, they cannot be held until that event has occurred. The necessary finality of assent is lacking." *Brause v. Goldman*, 10 A.D.2d 328, 332, 199 N.Y.S.2d 606, 611 (1st Dept.1960) (citing *Schwartz v. Greenberg*, 304 N.Y. 250, 107 N.E.2d 65 (1952)), *aff'd mem.*, 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961); *see V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). The Letter Agreement to which Sanford Freedman affixed his signature, explicitly recognized that US West had not yet assented to the 57th Street financing and, if it eventually decided to do so, would manifest assent in a formal commitment letter. No such letter was provided; therefore, US West did not assent to the 57th Street financing. *Brause*, 199 N.Y.S.2d at 611–12 (granting summary judgment); *see Reprosystem B.V. v. SCM Corp.*, 727 F.2d 257, 261–62 (2d Cir.) (party not bound where "documents ... clearly showed that intent ... was not to be bound prior to the execution of a formal, written contract."), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

■■■ It is true, as defendants assert, that the above quoted letter is obviously not an integrated writing embodying the entire alleged financing agreement. Nevertheless, if "the agreement is partly oral and partly written, parol evidence, while admissible to complete the written portion or to resolve some ambiguity therein, may not be used to vary or contradict its contents ... [I]f the writing be incomplete parol evidence may be admitted, 'not to contradict or vary, but to complete the entire agreement of which the writing was only a part.' " *Laskey v. Rubel Corp.*, 303 N.Y. 69, 71–72, 100 N.E.2d 140 (1951) (quoting *Thomas v. Scutt*, 127 N.Y. 133, 138, 27 N.E. 961 (1891)); *see Potsdam Central Schools v. Honeywell, Inc.*, 120 A.D.2d 798, 501 N.Y.S.2d 535, 537 (3d Dept.1986) (citing *Laskey* ). Because it is undisputed that US West did not issue a commitment letter, the plain language of the Letter Agreement means that there was no enforceable agreement to provide the financ-

ing. Under *Laskey*, the parol evidence rule bars any claim to the contrary.

Summary judgment on the First Counterclaim in favor of plaintiff is granted, and the First Counterclaim is dismissed.

### IV.

■ In their Second Counterclaim, defendants argue that US West, having made an unambiguous promise to extend over $15 million in financing upon which defendants reasonably and foreseeably relied to their detriment, is estopped to deny enforcement of its oral promise. *See Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986). The elements of promissory estoppel as a quasi-contract claim, are: (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) injury sustained by the party asserting the estoppel by reason of his reliance. *Id.; Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989).

Plaintiff first argues that defendants' reliance on the alleged promise was unreasonable. Plaintiff contends that sophisticated businessmen such as defendants could not reasonably have expected to secure a $15 million subleasehold mortgage loan without lender due diligence, negotiation of specific terms of the proposed loan and mortgage, and execution of a binding written loan and mortgage agreement. According to plaintiff, defendants must have known that no lender can make a binding mortgage commitment without at least (1) a review of the proposed security in order to determine whether a valid lien can be obtained, and (2) a written mortgage agreement. Plaintiff also points out that defendants were represented by experienced counsel and, therefore would have known that there was a risk that these complicated procedures would delay the transaction to a point where it would no longer be feasible. Finally, US West contends that such reliance was unforeseeable.

■ Defendants, however, allege a course of dealing between the parties which might make it reasonable for them to have assumed, and foreseeable that they would have assumed, that US West's representations constituted a binding agreement in principle. (Tollman Aff. ¶ 3) The business relationship between the parties may have been such that defendants reasonably concluded that Connor had the authority to bind US West, and that his word that the financing would be forthcoming was a sufficient basis upon which to commence the buy-out transaction. Moreover, no evidence has been submitted which shows that the necessary due diligence and drafting could not have been concluded in the time allotted for the transaction. Although defendants were experienced businessmen and represented by counsel, whether or not reliance is reasonable depends on specific factual circumstances. Certainly, there are situations in which sophisticated businessmen may be forced by circumstances to rely on promises they ordinarily would consider risky or uncertain. *See, e.g., Sosnoff*, 568 N.Y.S.2d at 46. Therefore, whether defendants reasonably and foreseeably relied on Connor's promise to provide the financing is a material issue of fact.

■ Plaintiff also argues that the actions taken by defendants allegedly in reliance on Connor's promise are not "unequivocally referable" to the promise and, hence, not sufficient to establish promissory estoppel. It is unclear whether the "unequivocally referable" standard must be met. If a promise is asserted as the basis to estop a party from employing the statute of frauds as an affirmative defense, then the party asserting promissory estoppel ordinarily must show that the acts taken in reliance are unequivocally referable to the oral promise. *Chromalloy American Corp. v. Universal Housing Systems, Inc.*, 495 F.Supp. 544, 551 (S.D.N.Y.1980), *aff'd*, 697 F.2d 289 (2d Cir.1982). However, as discussed in III, *supra*, plaintiff may be equitably estopped to raise the statute of frauds, and promissory estoppel used as the basis for a quasi-contract claim, as it is used by defendants here, may not require a showing that the acts allegedly taken in reliance be unequivocally referable to the oral promise. *See Rosenthal v. Kingsley*,

674 F.Supp. 1113, 1125 (S.D.N.Y.1987) ("Promissory estoppel, when invoked to excuse compliance with the Statute of Frauds, is distinct from the more common invocation of promissory estoppel to enforce a promise without any agreed consideration."); *Horn & Hardart Co. v. Pillsbury Co.*, 703 F.Supp. 1062 (S.D.N.Y.1989) ("There has been a dispute as to the applicability of the 'unequivocally referable' requirement beyond the context of the doctrine of part performance."); 3 *Farnsworth on Contracts* § 6.13 (1990). In any event, defendants have raised questions of material fact as to whether they relied and as to whether the acts taken in reliance were unequivocally referable to the alleged oral promise.

However, the promissory estoppel claim must be dismissed because defendants cannot show that the alleged oral promise to provide the 57th Street financing was "clear and unambiguous." *Esquire Radio & Electronics*, 804 F.2d at 793; *Arcadian Phosphates*, 884 F.2d at 73. As noted in III, *supra*, the Letter Agreement of August 9, 1989, stated that US West was not obligated to provide "the proposed financing until a formal commitment letter [was] executed and delivered." (Bullen Decl. Exh. 17) In other words, "[t]he negotiations ... made it clear that the obligations were contingent upon formal contract documents." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 264–65 (2d Cir.) (citing *Brause v. Goldman*, 10 A.D.2d 328, 199 N.Y.S.2d 606 (1st Dept.1960), *aff'd mem.*, 9 N.Y. 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961)), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

■■■ Regardless of any previous course of dealing and any actions taken in reliance, without a clear and unambiguous promise there is no promissory estoppel. The August 9 Letter Agreement shows not only that no such promise was given by US West, but instead proves a contingent promise. Therefore, defendants' promissory estoppel claim is deficient, and summary judgment dismissing the claim is warranted. *Reprosystem B.V.*, 727 F.2d at 264–65; *Shearson Lehman CMO, Inc. v. TCF*

*Banking and Savings, F.A.*, 710 F.Supp. 67, 73–74 (S.D.N.Y.1989) (dismissing promissory estoppel claim on summary judgment because parties did not intend promise to be enforceable before formal writings were executed).

### V.

In the Second Counterclaim defendants also allege negligent misrepresentation. They contend that Connor negligently misrepresented that US West would extend the financing necessary to complete the buy-out. Defendants allege that they relied to their detriment, and US West is liable for their reliance damages.

■■■ No action for negligent misrepresentation lies where the alleged misrepresentation is promissory rather than factual. *Murray v. Xerox Corp.*, 811 F.2d 118, 123 (2d Cir.1987) ("Promises of future conduct are not actionable as negligent misrepresentation."); *Margrove, Inc. v. Lincoln First Bank*, 54 A.D.2d 1105, 388 N.Y.S.2d 958, 960 (4th Dept.1976) ("The mere failure of defendant to abide by its commitment cannot be made the basis of an action in tort for misrepresentation.") Accordingly, that portion of defendants' Second Counterclaim which alleges negligent misrepresentation is dismissed.

### VI.

In their Third Counterclaim defendants allege that they were coerced into signing the Guaranty, and they are entitled to a declaratory judgment that the Guaranty is unenforceable. For the reasons stated in II, *supra*, defendants' Third Counterclaim is dismissed.

\*      \*      \*      \*      \*      \*

For the reasons stated above, plaintiff's motion for summary judgment and to dismiss defendants' counterclaims and affirmative defenses is granted. The parties are directed to confer regarding the amount and form of the award on plaintiff's claim under the Guaranty so that judgment can be entered. Absent an agreement, the parties are to submit by March 14, 1992 proposed judgments and statements no longer

than three pages, double spaced, explaining their differences.

SO ORDERED: