**P AND J G ENTERPRISES, INC.,
Pushpa Garg and Jagadish
Garg, Plaintiffs,**

v.

**BEST WESTERN INTERNATIONAL,
INC., Defendant.**

No. 93–CV–962.

United States District Court,
N.D. New York.

March 10, 1994.

Peter J. Scagnelli, Troy, NY, for plaintiffs.

Roland, Fogel, Koblenz & Carr, Albany, NY, Walter, Conston, Alexander & Green, New York City (Stephen S. Hart, of counsel), for defendant.

## MEMORANDUM–DECISION and ORDER

HURD, United States Magistrate Judge.

### I. INTRODUCTION.

The defendant, Best Western International, Inc. ("Best Western"), has moved for an order transferring this action to the United States District Court for the District of Arizona. The plaintiffs oppose the motion. Oral argument was heard on February 10, 1994.

### II. FACTS.

Plaintiff, P and J G Enterprises, Inc., is a closely held corporation which owned and operated a hotel known as The Albany Thruway House ("Thruway House") on Western Avenue in Albany, New York, since 1983. The sole shareholders of this corporation are the plaintiffs Jagadish Garg ("Garg") and his wife, Pushpa Garg. At the present time, the creditors of P and J G Enterprises, Inc. are operating the Thruway House. Plaintiffs claim to have invested approximately Five Million Dollars in the business.

Best Western is an Arizona Not for Profit corporation which franchises out its name and other services to independently owned hotels, motels, and resorts. It does not own, operate, or lease any properties, but provides its members with the support needed to compete with larger chain hotels and motels through services such as the use of name and logo, reservation system, advertising, and other support services.

In order for a hotel property to become a Best Western member, it must submit a formal application to Best Western which is evaluated and acted upon by the company's Board of Directors. An application may be either denied, conditionally granted, or contingently granted. A conditional grant of an application means that the applicant is offered membership on the condition that certain improvements are made to the property within a specified time period. During the conditional membership period, the hotel may not display the Best Western name or logo, nor may it use the services of Best Western. Once these improvements are made, the hotel moves to the contingent status and then to full membership. A contingency grant of membership is similar to a conditional membership, except there may be fewer conditions to be met and the hotel may use the Best Western name and logo, and it may take advantage of all the normal Best Western services.

In 1985, Garg was allegedly approached by Jack Barry ("Barry"), the Regional Manager of Best Western, to encourage the Thruway House to seek affiliation with Best Western.[1] Following some extended discussions in which Barry allegedly informed plaintiff that Best Western would definitely be interested in the Thruway House becoming a franchise member, Garg made an application in October 1987, to affiliate 110 rooms of the Thruway House with Best Western (Def.'s Not. Mot. Ex. A), and submitted an entrance fee in the amount of $17,500. On December 10, 1987, after inspection of the property, Garg's application was denied by Best Western's Board of Directors, and $15,500 of the entrance fee was refunded. Best Western kept

---

1. Best Western alleges that it was Garg who contacted Best Western and asked that a membership representative visit his hotel. Garg was allegedly told that the property did not meet Best Western standards, and the matter was not pursued by Garg until October 1987. Both parties agree that plaintiff's first application was submitted in October 1987, and it was denied. Best Western alleges that all three applications were submitted without solicitation.

$2,000 as a non-refundable "evaluation" fee. (*Id.* at Ex. B)

In 1988, Barry again allegedly approached Garg and encouraged him to re-apply for a Best Western franchise. Garg submitted a second application on July 8, 1988, with an entrance fee of $16,700 to affiliate 102 units. (*Id.* at Ex. C) On August 25, 1988, this second application was also rejected by the Board of Directors, and the company again indicated that it was retaining $2,000 of the fee as non-refundable. (*Id.* at Ex. D) After the threat of legal action, Best Western refunded the full fee to the plaintiffs. In late 1988, Barry, together with Ron Evans (CEO of Best Western), and attorney Kenneth Sundlof allegedly again convinced Garg to apply for a franchise. On March 17, 1989, for the third time, Garg applied for a membership for 110 units, and submitted an entrance fee of $20,225. (*Id.* at Ex. D & E)

On May 2, 1989, Garg received a conditional approval from the Board of Directors. (*Id.* at Ex. G) One of the conditions was that Garg affiliate all of the guest room units in the Thruway House, totalling 212 units [2] (including Buildings 700 and 800), and send an additional check of $10,200 for the balance of the entrance fee. Plaintiff replied by letter dated May 9, 1989, requesting that Best Western accept 104 units and exclude the 108 rooms in Buildings 700 and 800. (Pltf.'s Reply Aff. Ex. B) Plaintiff also requested a modification of other conditions. In a letter reply dated July 13, 1989, Best Western agreed to waive some of the conditions, but denied Garg's request to only affiliate 104 units, insisting that all units at the Thruway House be affiliated, including those in Buildings 700 and 800. (Def.'s Not.Mot. Ex. H at 2) It also extended the time for payment of the additional entrance fee to July 17, 1989. In a letter of July 14, 1989, Garg wrote to Best Western agreeing to include the 67 units in Building 800, but again requested a waiver of the remaining rooms in Building 700. (*Id.* at 4) On July 25, 1989, Best Western denied this request and extended the entrance fee payment deadline to July 28,

1989. (*Id.* at 6) On July 27, 1989, Garg accepted Best Western's conditions to include the units in Building 700, subject to receiving a loan of $200,000 which Garg subsequently received. (*Id.* at 7; Pltf.'s Reply Aff. Ex. C) He also sent an additional check in the sum of $10,200 as the remaining balance on the entrance fee.

In order to meet the conditions of the affiliation, especially the renovation of the rooms in Buildings 700 and 800, plaintiffs received financing, and spent over $800,000 to make the necessary improvements. Garg claims that in order to raise the additional $200,000 needed to complete renovation of Building 700, he subleased the property to a development corporation which, instead of providing the additional monies to obtain a Best Western franchise, embezzled funds belonging to the hotel. He was unable to meet the conditions set forth for the renovating of the units in Building 700.

In May and July 1990, Garg again attempted to have Best Western exclude the units in Building 700 from its affiliation. The Board of Directors again refused to waive the condition that the units in Building 700 be included, and further refused to grant Garg a further extension to complete the items on the conditional list. By letter of August 7, 1990, Best Western rescinded its conditional approval and denied Garg's application. (*Id.* at 14) The total entrance fee of $30,200 that Garg paid was retained by Best Western.

Plaintiffs allege that as a result of not obtaining the Best Western franchise, there was a default on loans secured to improve the property, a personal judgment was taken against Garg and his wife, and the Thruway House was lost to creditors, as well as any resulting profits.

The four causes of action in the complaint allege breach of contract, estoppel, unjust enrichment, and fraud/misrepresentation. The plaintiffs seek Five Million Dollars in compensatory damages, Two Million Dollars in punitive damages, and the return of the $30,450 entrance fee. Defendant in its answers denied the material allegations in the

---

**2.** The total number of rooms, and the number rooms which Garg wished to affiliate, fluctuated from time to time.

complaint and set forth a number of affirmative defenses, including that the action should be transferred to the United States District Court of Arizona, pursuant to 28 U.S.C. § 1404(a).

## III. *DISCUSSION.*

All of the applications submitted by Garg included the following language:

APPLICATION OF LAW

37. This Application and Agreement shall be governed and construed according to the laws of the State of Arizona, unless any obligations under this Application and Agreement shall be invalid or unenforceable under such laws, in which event the laws of the state whose laws can apply to and validate the obligations under this Agreement shall apply. This Application and Agreement shall be deemed executed in Phoenix, Arizona.

38. Applicant acknowledges that Best Western is headquartered in Phoenix, Arizona, that the majority of Best Western's records and employees are in Phoenix, Arizona, and that Phoenix, Arizona, is the most convenient locale for actions between Best Western and Applicant.

UNLESS WAIVED BY BEST WESTERN IN WHOLE OR IN PART, THE COURTS LOCATED IN THE STATE OF ARIZONA, STATE OR FEDERAL, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ALL CLAIMS, DISPUTES AND ACTIONS ARISING FROM OR RELATED TO THIS APPLICATION AND AGREEMENT OR TO ANY RELATIONSHIP BETWEEN THE PARTIES HERETO AND VENUE SHALL BE IN THE COURTS LOCATED IN MARICOPA COUNTY, ARIZONA. APPLICANT EXPRESSLY CONSENTS AND SUBMITS TO THE JURISDICTION OF SAID COURTS AND TO VENUE BEING IN MARICOPA COUNTY, ARIZONA.

Absent the forum selection clause, it is conceded that venue in this diversity action is proper in the Northern District of New York. P and J G Enterprises is incorporated in New York, and the individual plaintiffs are residents of New York. Best Western is incorporated in Arizona, although it is arguable subject to personal jurisdiction in New York. 28 U.S.C. § 1391(a)(3). Obviously, the existence of the forum selection clause adds a significant dimension to the proper location for venue.

▬ The Supreme Court has held that in a diversity action wherein the defendant moves to enforce a forum selection clause, the standard for determining whether transfer is appropriate is the same for a transfer of venue motion pursuant to 28 U.S.C. § 1404(a). *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29–30, 108 S.Ct. 2239, 2243–44, 101 L.Ed.2d 22 (1988). Without a forum selection clause, the burden of proving that a matter should be transferred to another district is on the movant. *Aquatic Amusement Assoc., Ltd. v. Walt Disney World Co.,* 734 F.Supp. 54, 56 (N.D.N.Y.1990).[3] The factors that courts consider in determining whether an action should be transferred include:

[T]he convenience of the parties; the convenience of the witnesses; the relative ease of access to the sources of proof; the availability of process to compel attendance of unwilling witnesses; the cost of obtaining willing witnesses; practical problems that make trial of a case easy, expeditious, and inexpensive; and the interests of justice.

*Aquatic Amusement,* 734 F.Supp. at 56 (quoting *Vassallo v. Niedermeyer,* 495 F.Supp. 757, 759 (S.D.N.Y.1980)).

▬ Normally, the movant bears a heavy burden to establish that a case should be heard in another forum, "for a plaintiff's choice of a forum is accorded considerable weight, 'and will not be disturbed except upon a clear-cut showing that convenience and justice for all parties demands that the litigation proceed elsewhere.'" *First Federal Sav. Bank v. Tazzia,* 696 F.Supp. 904, 910 (S.D.N.Y.1988) (citations omitted). In *Stew-*

---

3. In fact, "unless the balance is *strongly* in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v.* *Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) (emphasis added).

*art,* 487 U.S. at 29–31, 108 S.Ct. at 2244, which is the principal Supreme Court case setting forth the standard for determining whether a transfer is appropriate where a defendant moves to enforce a forum selection clause, the court stated that:

> The presence of a forum selection clause.... will be a significant factor that figures centrally in the district court's calculus.... The forum selection clause which represents the parties' agreement as to the most proper forum should receive neither dispositive consideration ... nor no consideration ..., but rather the consideration for which Congress provided in § 1404(a).

■ Therefore, just as the selection of venue by the plaintiffs is entitled to great, but not dispositive weight, the existence of a forum selection clause is also not entitled to dispositive weight. Unlike a normal § 1404(a) motion to transfer venue, however, once the movant has shown the existence of a valid forum selection clause, it is incumbent upon the plaintiff to demonstrate by a preponderance of evidence that such clause should not be enforced either because the convenience of witnesses, or the interest of justice demand otherwise. *See In re Ricoh Corp.,* 870 F.2d 570, 573 (11th Cir.1989) (Upon remand by the Supreme Court in *Stewart,* the Eleventh Circuit held that "the clear import of the Court's opinion is that the venue mandated by a choice of forum clause rarely will be outweighed by other 1404(a) factors.") Moreover, in *Weiss v. Columbia Pictures Television, Inc.,* 801 F.Supp. 1276, 1278 (S.D.N.Y.1992), the court opined that *Stewart* "did not intend to disturb the general rule that forum selection clauses are regularly enforced." The court further held that the forum selection clause is entitled to "substantial consideration," although it is not dispositive. *Id.* In order for the clause to be enforceable, however, it must be deemed "valid"; once that occurs, "the burden shifts to the plaintiff to demonstrate exceptional facts explaining why he should be relieved from his contractual duty." *Id.*

The plaintiffs contend that despite the forum selection clause, venue should remain in the Northern District of New York, and not be transferred to the District of Arizona, because it is more convenient for witnesses and in the interests of justice.

### A. *Convenience of Witnesses.*

■ The following twelve persons, along with their respective locations, have been identified by the plaintiffs as being material witnesses in the case: [4]

1–2. The two individual plaintiffs—Albany, New York;

3. Jack Barry—Boston, Massachusetts;

4. Christopher Welch—Utica, New York;

5. Ken Sundlof, Esq.—Arizona;

6. Ron Evans—Arizona;

7. Arthur Ardman—Albany;

8. James Redmond—Albany

9. Jack P. Schlieffer—New York City

10. James Brunner, Esq.—Albany

11. Senator Howard Nolan—Albany

12. Jean Tahum—Albany

Four of the witnesses—Barry, Welch, Sundlof, and Evans—are all associated with Best Western.

Best Western has identified as material witnesses the following eight members of the Board of Directors and their respective locations, who acted upon the plaintiff's applications for membership:

1. Phil Trumbo—Colorado

2. Dale Freiberger—New Mexico

3. James Heckman—Missouri

4. Troy Davis—Tennessee

5. Jack Stovall—Arizona

6. John McCoy [5]—West Virginia

7. Lloyd Lundy—Kansas

8. Donald Lightenburger—Colorado

As an initial matter, the court is unable to accept plaintiffs' contention that Best West-

---

4. At oral argument, plaintiff served a Supplemental Affidavit which the court has now decided to accept in reaching its decision.

5. Mr. McCoy has also been identified by the plaintiffs as being involved in the application negotiations.

ern's own employees should be used in determining the convenience of witnesses. Plaintiff has identified five potential witnesses that all allegedly made misrepresentations on behalf of Best Western concerning their chances at receiving a franchise. These witnesses would presumably be favorable to Best Western, and should not be part of the plaintiffs' convenience of witnesses argument. In any event, the expense borne to bring them to trial would be made by Best Western, and if it wishes to have these witnesses travel to Arizona for the trial, it would be at their expense.[6] Therefore, since plaintiffs' key material witnesses are employed by defendant—only one of whom lives in the Northern District—the convenience of these witnesses does not weigh in favor of the plaintiffs.

Most of the plaintiffs' remaining witnesses are with regard to the loans secured by the plaintiffs, and the renovations made to the hotel in an attempt to comply with the conditions set forth in the acceptance. Few, if any, of these witnesses had anything to do with the three applications made by the plaintiffs, the alleged fraudulent representations made by defendant's employees, or the conditional acceptance by the defendant. Most relate to the damages allegedly incurred by the plaintiffs as the result of the alleged breach of contract, or the alleged unreasonableness of the defendant in enforcing the conditions which had been accepted by the plaintiffs. At best, then, the convenience of witnesses weighs evenly on both sides, and in this regard the plaintiffs have failed to "demonstrate exceptional facts explaining why [they] should be relieved from [their] contractual duty." *Weiss*, 801 F.Supp. at 1278.

## B. *Interests of Justice.*

In contending that the forum selection clause should not be enforced in the interest of justice, the plaintiffs point to: (1) allegations of fraudulent inducement in the contract; (2) the gross disparity of bargaining power between the parties; and (3) public policy reasons.

With regard to the allegations of fraud, the plaintiffs have failed to come forward with sufficient evidence to vacate the forum selection clause. Three times the plaintiff voluntarily made application to Best Western for a franchise agreement which contained the forum selection clause in bold letters. Twice the applications were rejected under conditions which should have warned the plaintiffs that the defendant was a very hard bargainer. There is no indication that the plaintiffs were forced to make these applications because of any adverse financial conditions caused by the defendant. The plaintiffs were attempting to improve their financial circumstances. On the third application, the defendant gave conditional approval which resulted in further negotiations, and an agreement to change some of the conditions. There is no indication, however, that plaintiffs made any effort to negotiate the terms of the forum selection clause, nor is there any indication that it would have been futile to so negotiate since plaintiff had been successful in negotiating some of the other conditions placed on the contingency membership.[7]

Garg appears to be a successful and experienced businessman; and despite being turned down twice for membership, and threatening suit in order to receive the return of his evaluation fee on the second occasion, he still made a third application and payment. It was only after the third application with entrance fee, conditional acceptance, modification of the conditions, additional entrance fee payment, and the contract was in place, that plaintiffs were unable to fulfill the conditions of the agreement. Plaintiffs allege that the defendant acted in

---

6. Plaintiffs admit that the representations made by these Best Western employees, "presumably Defendant party witnesses," are the "key to the prosecution of this case." (Pltf.'s Supl.Mem. at 5) Again, however, it is the defendant who will bear the cost of making them available for all proceedings which would be cost effective for at least two of the five witnesses since they are located in Arizona.

7. Moreover, there are no allegations that the forum selection clause itself was the product of fraudulent behavior, or that it was inconspicuously placed in the membership application. Plaintiff executed the membership application, and should have been aware that it contained a clause agreeing to forum selection.

bad faith in inducing plaintiffs to apply for a franchise, and then in refusing to waive, in particular, the requirement that Building 700 be included in the franchise. Whether such alleged behavior would be considered merely a breach of contract and/or fraudulent behavior on the part of the defendant need not be decided at this time. For the purposes of this motion, there is a valid contract and forum selection clause in existence. The plaintiffs agreed to the venue of any litigation in Arizona, and must now live by the terms.

The plaintiffs contend that they are a small "Mom and Pop" operation as opposed to the vast international business of Best Western, and that their bargaining position, and the relative strength of the two parties, requires that the matter be tried in New York for their convenience. Plaintiffs, however, admit that they spent over Five Million Dollars in renovating the property, and borrowed over $800,000 for improvements in attempts to meet the conditions set forth by Best Western. The Thruway House is a 200+ room hotel, and not a four room "bed and breakfast." There has been no demonstration by plaintiffs that their bargaining position was weak at the time Garg executed the three applications containing the forum selection clause, the conditional acceptance by the defendant, or even after the exchange of letters, and finally agreeing to conditions with the submission of an additional franchise fee of over $10,000. Thereafter, the plaintiffs' bargaining position may have become weak, but this was mainly due to plaintiffs' financial circumstances and Best Western's insistence that the conditions of the agreement be satisfied. *See US West Financial Servs., Inc. v. Tollman,* 786 F.Supp. 333, 340 (S.D.N.Y. 1992) ("Mere hard bargaining positions, if lawful, and the press of financial circumstances not caused by defendant, will not be deemed duress.") In any event, if the plaintiffs really believe that they are entitled to over Seven Million Dollars in damages, the inconvenience and expense of trying the case in Arizona should be of little import.

Finally, the plaintiffs rely on *Red Bull Assoc. v. Best Western Int'l, Inc.,* 862 F.2d 963 (2d Cir.1988), in which the Second Cir-

cuit refused to enforce the very same forum selection clause at issue in this case. However, *Red Bull* involved allegations that Best Western violated civil rights laws—laws and policies which are of vital importance to the country. Such allegations are completely absent in this case. There are no allegations of discrimination. There are no public policy issues comparable to those in *Red Bull.* This is basically a contract dispute between the parties, including allegations of fraud. It is therefore no different than the many contract disputes throughout the land. For reasons not yet decided, the plaintiffs were unable to meet their contractual obligations with a large corporation. This, however, does not overcome plaintiffs' burden to show that an important public policy militates against transfer to the District of Arizona.

## IV.  CONCLUSION.

There is a valid forum selection clause in existence between the parties which designates the State of Arizona as the venue for any legal proceedings. Therefore, the burden shifts to the plaintiffs to demonstrate that there are sufficient grounds to vacate such a clause and to allow the matter to remain in the Northern District of New York. The plaintiffs have failed to meet their burden.

Therefore, it is

ORDERED, that

1. The defendant's motion for change of venue from the Northern District of New York to the District of Arizona is granted; and

2. The Clerk is directed to transfer this file to the Clerk of the Court for the United States District Court of the District of Arizona.

IT IS SO ORDERED.