Toni E. Sosnoff, Appellant, v Jason D. Carter et al., Respondents.

First Department, April 2, 1991

### APPEARANCES OF COUNSEL

*Daniel A. Pollack* of counsel *(Joseph F. Donley* and *Richard D. Owens* with him on the brief; *Shereff, Friedman, Hoffman & Goodman,* and *Pollack & Kaminsky,* attorneys), for appellant.

*Edward A. Friedman* of counsel *(Robert D. Kaplan* and *Hal Neier* with him on the brief; *Friedman & Kaplan,* attorneys), for respondents.

### OPINION OF THE COURT

Asch, J.

During the booming 1980's, sophisticated and successful real estate developer Jason Carter entered into a partnership agreement with a wealthy investor and money manager Martin Sosnoff to build a large residential project in Manhattan. Before their venture came to final fruition, the market crash of 1987 took place. Carter alleges that Sosnoff as a result repudiated his partnership obligations. Carter asserts that faced with financial ruin, he was forced to agree to a transformation of Sosnoff's equity investment into a debt and to give Sosnoff a note for this "debt". He contends this constituted economic duress by Sosnoff which presents a viable defense to this action on the note. Countering this legal argument, Sosnoff claims that Carter ratified the creditor-debtor relationship which replaced the partnership by continuing to make payment of interest and principal on the note, for almost two years after the parties entered the new agreement.

Wolfgang Friedmann has pointed out that "For the strong or lucky, freedom of trade just means freedom to expand; it means the survival of the fittest and the eventual destruction of the weak." (Law in a Changing Society, at 293 [2d ed Colum U Press].) To ameliorate the most harsh consequences of economic Darwinism, legal devices such as the antitrust laws, doctrines of unconscionability and impossibility of performance were invented. Among such doctrines is that of economic duress. We are presented in this case with the question of whether or not "economic duress" should be invoked to excuse nonperformance.

Plaintiff Toni Sosnoff seeks to recover the principal sum of $7,945,649.55 with interest and costs on a promissory note executed by defendant Jason D. Carter in the face amount of $9,145,648.55 and a written guarantee of payment executed by his wife, defendant Julia Vance Carter, both dated as of July

1, 1988. They were executed in favor of the plaintiff's husband, Martin T. Sosnoff, and thereafter assigned to her.

The defendants do not deny that the July 1988 note is in default, but assert rather that they were forced to sign the initial November 1987 note, and guarantee the then-modified note and guarantee of July 1988 under economic duress.

In November 1985, defendant Jason Carter, a real estate developer, who had participated in the rehabilitation of the Ritz Theatre on West 48th Street, New York, and Martin Sosnoff, a wealthy investor and money manager who Carter had met through a common accounting firm signed two letter agreements. These provided for the $105,000,000 development of a residential highrise on West 48th Street in Manhattan, to be known as the Ritz Plaza. Their agreement provided that Sosnoff would contribute 80% of the necessary equity and collateral in exchange for 80% of the tax benefits and 50% of the profits.

Subsequently, from November of 1985 to October of 1987, Sosnoff complied with their partnership agreement, contributing his share of the capital and the necessary loan collateral. Defendant Carter, on behalf of the venture, contracted to acquire the real property from the owners of Momma Leone's Restaurant, as well as certain development rights from the owners of the contiguous O'Neill Theatre.

Both Sosnoff and Carter obtained a letter of credit from Citibank, made a $1,875,000 payment toward the Momma Leone's acquisition in the agreed 80/20 ratio, took steps to satisfy zoning requirements and pursued various real estate tax benefit programs, including an application to the United States Department of Housing and Urban Development (HUD) for a permanent mortgage of $90,000,000, signing the requisite application forms as equal principals.

Although the closing of the real estate and development rights was scheduled for November 19, 1987, and Marine Midland Bank officially approved a bridge loan, Martin Sosnoff announced, before then, that he would make no further capital contributions, and that he would not participate in the $20,000,000 bridge loan which he and defendant Carter had obtained from Marine Midland Bank to finance the closing.

Specifically, on November 3, 1987, the very date that Marine Midland approved the bridge loan, Sosnoff's attorney wrote to defendant Carter's attorney, notifying him that "Martin Sosnoff does not intend to participate in a $20 million

proposed commitment from Marine Midland", and expressing "Martin Sosnoff's desire to terminate any relationship" with defendant Carter, requesting that defendant Carter repay "the amounts advanced or otherwise made available by [Sosnoff] or on his behalf".

Despite a subsequent letter from defendant Carter's attorney urging Sosnoff to remedy his default, participate in the Marine Midland loan and otherwise fulfill his obligations defendants assert Sosnoff refused to honor his commitments.

Further, according to defendant Carter, Sosnoff's refusal to abide by the joint venture agreement threatened a complete collapse of the Ritz project. He claims that this turn of events brought him to the brink of financial ruin because without Sosnoff's participation, the Marine Midland bridge loan was lost and no other bank was willing to lend the $20,000,000 required to purchase the Momma Leone's property and to commence construction on the project. The failure to close would also have constituted a default under the Momma Leone's contract, resulting in the forfeiture of the $1,875,000 cash deposit, causing the owners of Momma Leone's to draw down the letter of credit from Citibank, by then amounting to approximately $4,675,000, on which defendant Carter was personally liable.

Moreover, according to defendants, the day after Sosnoff announced his abandonment of the project, Carter's attorney advised Sosnoff's attorney that Carter was "exploring other financial possibilities * * * in an effort to ameliorate the mounting damage exposure".

Nevertheless, according to the defendants, despite Carter's attempt to find someone to replace Sosnoff in the venture shortly before the scheduled November 19, 1987 closing, and under the dire circumstances created by Sosnoff's breach, the best that Carter could do was to obtain a $8.5 million short-term loan from BRT Realty Trust at a high interest rate of 5% above prime, which, by its terms, only provided $4,000,000 toward the scheduled closing, leaving Carter several million dollars short.

Sosnoff then offered to lend the partnership an additional $1.7 million and to convert into cash the $4,675,000 letter of credit from Citibank. This would enable the Momma Leone acquisition to go forward. In exchange for this offer, Sosnoff demanded that the nearly $7.5 million in equity he had previously contributed to the partnership be converted to

short-term debt; that defendant Carter release Sosnoff from his obligation to contribute 80% of the partnership's equity; that defendant Carter personally guarantee the combined $9.1 million obligation; and that his wife, defendant Julia Carter, guarantee $1.7 million of that.

The defendants allege that faced with the threat of default on the Momma Leone and O'Neill contracts, they unsuccessfully protested that Sosnoff's proposal amounted to nothing more than the unilateral repudiation of a partnership agreement, and hence were forced to capitulate.

Accordingly, on November 19, 1987, the date of the closing, defendant Carter signed a note on behalf of Sosnoff-Carter Associates, promising to pay Sosnoff $9,145,648.55, plus 9% interest in periodic installments over a three-year period. Defendants Jason and Julia Carter signed personal guarantees in a release discharging Sosnoff from partnership-related claims, and Sosnoff signed a letter announcing his resignation from the partnership, thereby transforming himself from a major equity investor dependent upon uncertain profits into a lender with a smaller, secured and guaranteed loan.

Although Sosnoff and defendant Carter had signed the application for the mortgage as coprincipals, Sosnoff nevertheless refused to consent to make certain minor modifications required by HUD before approving the mortgage, unless defendant Julia Carter agreed to increase her guarantee to cover the full amount of Sosnoff's "loan". Thus, according to defendants, faced with certain financial disaster if Sosnoff carried out his threat to block the HUD loan and thereby destroy the Ritz Plaza project, defendant Julia Carter signed the July 1988 guarantee as demanded by Sosnoff.

Finally, defendants alleged that defendant Carter was forced to mortgage everything he owned, including his family's residence, in order to keep the Ritz Plaza project alive. Carter also made a number of principal and interest payments to Sosnoff so as to avoid triggering cross default provisions in the loan agreements entered into by him until May of 1989 when he stopped making any payments on the Sosnoff note. Shortly thereafter, this action was commenced for summary judgment in lieu of complaint pursuant to CPLR 3213.

The Supreme Court denied plaintiff's motion for summary judgment, finding triable issues of fact with respect to the defendants' affirmative defense of economic duress, possible ratification, abatement of duress and as to whether the defen-

dants had acted reasonably, under the circumstances, in disaffirming the note and guarantee, and also upon the court's *sua sponte* determination, that the note and guarantee which the plaintiff had sued upon were not "instrument[s] for the payment of money only" within the meaning of CPLR 3213.

"The applicable law is clear * * * [a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will" *(Austin Instrument v Loral Corp.,* 29 NY2d 124, 130). A demonstration of economic duress can be made by proof that one party to a contract has threatened to breach the agreement by withholding performance unless the other party agrees to some further demand *(805 Third Ave. Co. v M.W. Realty Assocs.,* 58 NY2d 447, 451; *Austin Instrument v Loral Corp., supra).* This showing of a threatened violation of the contractual obligations by itself ordinarily will not suffice. However, economic duress is established when the facts show that such breach will result in an irreparable injury or harm. (13 Williston, Contracts § 1617, at 704-705 [3d ed]; *Austin Instrument v Loral Corp., supra,* at 130.)

The defendants in opposition to the summary judgment motion herein, submitted sworn affidavits and exhibits, including agreements between the parties. These documents raise a substantial issue as to whether Sosnoff's repudiation of his partnership obligation just days before the scheduled acquisition of the Ritz Plaza site forced defendants to agree to the promissory note and guarantee, upon which, with the July 1988 modifications, plaintiff brings this action.

■ Plaintiff asserts that defendants failed to show that there were no other financial alternatives. The mere threat to breach an agreement will not constitute economic duress if the threatened party can obtain performance from some other "source of supply" and the ordinary remedy of an action for breach of contract would be adequate *(Austin Instrument v Loral Corp., supra,* at 130-131). While defendants did not demonstrate beyond doubt that they lacked other funding alternatives, they did show that they explored other financing possibilities, without success. Hence, in their opposition to the summary judgment motion, they met the burden of at least raising a viable issue.

■ Plaintiff also asserts defendants waived any defense of economic duress by their delay in repudiating the new agree-

ments promptly and by ratifying the debt in making interest and principal payments. One who would disaffirm a contract made under duress must act promptly to repudiate it or be deemed to have elected to affirm *(Bethlehem Steel Corp. v Solow,* 63 AD2d 611, 612). However, where during the period of acquiescence or at the time of the alleged ratification the disaffirming party is still under the same continuing duress, he has no obligation to repudiate until the duress has ceased (13 Williston, Contracts §§ 1624, 1627 [3d ed]; Restatement [Second] of Contracts § 381; *Austin Instrument v Loral Corp., supra,* at 133). In fact, such continuing economic duress would even have the effect of tolling any period of limitations if the disaffirming party has commenced the action *(see, Baratta v Kozlowski,* 94 AD2d 454, 458-459).

Defendant Carter detailed how the dire financial circumstances which compelled him to sign the note continued and alleged that he ceased payments on the note promptly at a point when he believed his other financial backers would not treat that action as a default on their obligations. Further, defendants made a showing, also in opposition, of their repeated protests as to the conduct of Sosnoff. These protests were inconsistent with any act of ratification and were some evidence of defendants' preservation of a claim of economic duress *(see, Citibank v Real Coffee Trading Co.,* 566 F Supp 1158, 1163-1164; cf., *1163 Realty Corp. v United Institutional Servicing Corp.,* 55 AD2d 908, 909).

Upon a motion for summary judgment, the function of the reviewing court is not to determine the issues but only if there *are* issues *(Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395). In fulfilling that function, the court must make all reasonable inferences in favor of the party opposing summary judgment *(Robinson v Strong Mem. Hosp.,* 98 AD2d 976). Applying these principles to the facts before us clearly compels the conclusion that the defendants demonstrated the existence of genuine triable issues of fact. Consequently, the Supreme Court properly denied summary judgment. In view of this finding, the procedural issue of whether the July 1988 note and guarantee were "instrument[s] for the payment of money only" within the meaning of CPLR 3213 is academic and we do not address it.

Accordingly, the order of the Supreme Court, New York County (Carol Huff, J.), entered on March 27, 1990, which denied plaintiff's motion pursuant to CPLR 3213 for summary

judgment in lieu of complaint, should be affirmed, without costs or disbursements.

SULLIVAN, J. P., ROSENBERGER, WALLACH and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on March 27, 1990, affirmed, without costs or disbursements.