Beltway 7 & Props., Ltd. v Blackrock Realty Advisers, Inc. (2018 NY Slip Op 07844)





Beltway 7 & Props., Ltd. v Blackrock Realty Advisers, Inc.


2018 NY Slip Op 07844


Decided on November 15, 2018


Appellate Division, First Department


Mazzarelli, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 15, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick,J.P.
Judith J. Gische
Angela M. Mazzarelli
Cynthia S. Kern
Peter H. Moulton,JJ.


654187/16 7154 

[*1]Beltway 7 & Properties, Ltd., Plaintiff-Appellant,
v
Blackrock Realty Advisers, Inc., et al., Defendants-Respondents.



Plaintiff appeals from the order of the Supreme Court,
New York County (O. Peter Sherwood, J.), entered September 19, 2017, which granted defendants' motion to dismiss the complaint.




Schlam Stone & Dolan LLP, New York (Jeffrey M. Eilender and Seth D. Allen of counsel), for appellant.
Dewey Pegno & Kramarsky LLP, New York (Thomas E.L. Dewey and L. Lars Hulsebus of counsel), for respondents.



MAZZARELLI, J.


Defendants (collectively, Blackrock) are the assignees of a $25 million mezzanine loan originally made by nonparty JP Morgan to plaintiff. The mezzanine loan was secured by plaintiff's interest in an affiliated entity called L Reit Ltd., which in turn owned real property in Texas. Around the time that JP Morgan extended the mezzanine loan to plaintiff, it made a $26 million mortgage loan to L Reit.
Pursuant to the agreement that governed the mezzanine loan, plaintiff was required to make payments on the "Payment Date," defined as "the ninth (9th) day of each calendar month during the term of the Loan," or the nearest previous business day if the ninth day was not a business day. The portion of those monthly payments attributable to interest was to be calculated based on interest accruing between the fifteenth day of the prior calendar month and the fourteenth day of the calendar month during which a "Payment Date" fell. The agreement provided that the maturity date for the loan would be November 9, 2014, at which time plaintiff [*2]would be required to pay off the principal balance, including all accrued and unpaid interest. November 9, 2014 was a Sunday, so the actual maturity date pursuant to the agreement was November 7. The agreement also provided for a late payment penalty, which entitled the lender to demand, upon plaintiff's failure to make any required payment, "the lesser of five percent (5%) of such unpaid sum or the Maximum Legal Rate" (defined in the agreement as the maximum nonusurious interest rate under applicable law).
As the maturity date approached, plaintiff negotiated to refinance the mezzanine loan and the mortgage loan with JP Morgan, and scheduled a closing for November 7, 2014, the maturity date for both loans. However, shortly before that date, plaintiff discovered that an umbrella insurance policy it was required to maintain for the properties securing the mortgage loan had lapsed. Keybank, which JP Morgan had appointed to service the mortgage loan, was responsible for paying the insurance premiums out of plaintiff's monthly loan payments. However, it failed to make the $8,600 payment necessary to renew the umbrella policy. JP Morgan refused to refinance the two loans until the insurance issue was resolved, which was on November 14, when the new loans closed.
Because plaintiff missed the maturity date payment by one week, Blackrock decided to exercise its right under the mezzanine loan agreement to impose a late charge. It calculated the charge as 5% of the unpaid indebtedness, a sum of approximately $1.2 million. Further, it sought an additional interest payment to cover the interest period running from November 15 to December 14. In contrast to Blackrock, JP Morgan did not penalize plaintiff for settling the mortgage loan one week late. It did persuade Blackrock, however, to reduce the late charge to $500,000. Nevertheless, needing to satisfy the mezzanine loan before it could close on the refinance, and facing the imminent loss of its properties to foreclosure, plaintiff paid the approximately $844,000 demanded by Blackrock.
Sometime after these events, plaintiff sued Keybank in Texas. That action was withdrawn, on terms not disclosed in the record. Approximately 1 1/2 years later, plaintiff commenced this action. The first cause of action in the complaint was for breach of contract, asserting that Blackrock misconstrued the loan agreement in charging interest for the contractual period of November 15 to December 14, since interest was intended to accrue only during the term of the mezzanine loan, which expired when plaintiff satisfied it. The second cause of action sought a declaratory judgment that the late charge and additional interest were unenforceable as penalties that were disproportionate to the harm actually suffered by Blackrock. The third cause of action sought restitution of the amounts that plaintiff claims it was unlawfully forced to pay to Blackrock.
Blackrock moved to dismiss the complaint in its entirety, pursuant to CPLR sections 3211(a)(1) and (7). It argued that it properly applied all relevant contractual provisions, and that, in any event, plaintiff's claims were barred by the voluntary payment doctrine. In response, plaintiff submitted an amended complaint, which added a cause of action seeking a declaratory judgment that plaintiff made the payment under economic duress and under protest, and upon a mistake of law and fact, such that the voluntary payment doctrine did not apply. Plaintiff also submitted the affidavit of its president, Mohammad Nasr, in which he reiterated the allegations in the amended complaint, including that plaintiff protested the charges after Blackrock announced its intention to impose them, but determined that it had no choice but to pay.
Blackrock agreed to treat its motion as if directed to the amended complaint. It argued that there was no allegation of a written protest, as required, that plaintiff's allegations of duress were substantively insufficient and in any event waived by the passage of time, and that there was no cognizable mistake of law or fact. Blackrock also argued that the charges were all proper under the mezzanine loan agreement.
The court granted the motion in its entirety and dismissed the amended complaint. It [*3]rejected plaintiff's allegation that it made the payment under protest, since it had stated no facts concerning the manner in which such protest was lodged. Regarding plaintiff's argument that it made the payment under a mistake of fact or law, the court observed that this was not possible since Blackrock had explained the basis for the charges. Moreover, the court held, plaintiff failed to allege that it made a reasonable effort to learn what its actual legal obligations to Blackrock were. Finally, the court, acknowledging that a threatened loss of property could form the basis of a claim of economic duress, and intimating that plaintiff had sufficiently alleged duress, rejected the defense. This, the court stated, was because plaintiff sat on its rights, having waited 1 1/2 years to commence this action.
In seeking to avoid application of the voluntary payment doctrine, plaintiff first contends on appeal that it made clear to Blackrock that its payment was not voluntary at all. The doctrine
"bars recovery of payments voluntarily made with full knowledge of the facts, in the absence of fraud or mistake of material fact or law (Dillon v U-A Columbia Cablevision of Westchester, 100 NY2d 525 [2003]). The onus is on a party that receives what it perceives as an improper demand for money to take its position at the time of the demand, and litigate the issue before, rather than after, payment is made' (Gimbel Bros. v Brook Shopping Ctrs. (118 AD2d 532, 535 [2d Dept 1986])" (DRMAK Realty LLC v Progressive Credit Union, 133 AD3d 401, 403 [1st Dept 2015]).
In DRMAK Realty, we suggested that the effects of the doctrine can be overcome by a timely protest. However, the party that made the payment must give some indication that it "took steps to indicate that [it] was reserving [its] rights" (133 AD3d at 405). Here, plaintiff points to nothing more than conclusory statements in its amended complaint and in Nasr's affidavit that it protested. It does not state in what medium it communicated the protest, the person to whom it conveyed the protest, or any details of what the protest specifically consisted of. To be sure, there is an email chain in the record in which Nasr says to, inter alia, JP Morgan's agent, "Am I paying Dec. interest no matter what, this is not right?" and then is advised by the agent that "it is in your best interest to close the loan and then after this loan in [sic] securitized take up your claims with them at that time." However, assuming, without deciding, that JP Morgan acted as Blackrock's agent, there is no indication that plaintiff actually placed JP Morgan on notice that it intended to dispute the payment after it paid. Furthermore, the email chain makes no reference to the late charge. Under even the most liberal pleading standards, the allegation of protest is insufficient.
Plaintiff asserts that, even if it did not lodge a proper protest at the time of the payment, it can still recover the payment if it can establish that it was made under economic duress or as the result of a mistake. We dispose of the latter theory fairly easily. First, any argument that plaintiff was mistaken in believing that the late charge and additional interest payment were permitted by the mezzanine loan agreement logically conflicts with Nasr's claim that he protested the payment. Further, to the extent that plaintiff argues that the mistake was its belief that it would be able to pay the charges and then challenge them at a later date, we find that plaintiff has not alleged sufficient facts to support that position. Moreover, we note that plaintiff is a sophisticated party that either understood its rights or had the wherewithal to learn them in relatively short order.
The relative sophistication of the parties is not a factor to be considered in assessing a claim of economic duress (see DRMAK Realty, 133 AD3d at 404). Economic duress exists where a party is compelled to agree to terms set by another party because of a wrongful threat by the other party that prevents it from exercising its free will (see 805 Third Ave. Co. v M.W. Realty Assoc. 58 NY2d 447, 451 [1983]). Accordingly, our analysis consists of two prongs: first, [*4]whether Blackrock's decision to demand the late charge and extra interest payment was lawful, that is, based on rights enumerated in the agreement; and second, if it was not, whether the demand placed plaintiff in a position such that it had no other choice but to accede. With respect to the first prong, Blackrock relies on M.W. Realty in arguing that, because the mezzanine loan agreement is part of the record, we can decide, even at this procedural posture, that, as a matter of law, the charges were not wrongful. In that case, plaintiff, a developer, claimed duress when the defendant, from which the plaintiff had contracted to purchase air rights so it could build a 31-story building, sought to extract more favorable terms from the plaintiff after the plaintiff had begun construction. The Court rejected the duress claim because after reviewing the contract, which was annexed to the complaint, it concluded that the defendant's obligation to transfer the air rights had not yet been triggered when it sought the modification. The Court affirmed dismissal of the complaint because "a party cannot be guilty of economic duress for refusing to do that which it is not legally required to do" (58 NY2d at 453). Defendant argues that, here too, the agreement plainly establishes that it had the right to make the demand it did. Plaintiff, in contrast, asserts that the late charge provision is, at the very least, ambiguous with respect to how Blackrock was to calculate the charge, and that, even if the calculation was correct, it constitutes an unenforceable penalty.
We agree that the relevant contractual provisions are ambiguous, as they are each susceptible to more than one reasonable interpretation (see Ellington v EMI Music, Inc., 24 NY3d 239, 244 [2014]). As plaintiff notes, the 5% rate is expressly stated to apply to the "unpaid sum." However, whether the "Maximum Legal Rate" is to be applied to the unpaid sum or something else is unclear. Plaintiff suggests that it was intended to apply to the length of time that payment was outstanding, which was seven days. Blackrock counters by, inter alia, characterizing the "Maximum Legal Rate" as a standard savings provision designed to ensure that it not be deprived of any recourse at all if payment is tardy. Each of these arguments has merit, and neither is susceptible of resolution at the pleading stage (see Nina Penina, Inc. v Njoku, 30 AD3d 193, 193-194 [1st Dept 2006]).
There is similar uncertainty concerning whether Blackrock was justified in charging interest for the November to December period. Blackrock argues that because payment can only be made on a "Payment Date," and plaintiff missed the November 9th payment date, interest was properly charged through the next interest period, which ran from November 15 through December 14. Plaintiff counters that the term "Payment Date" is specifically defined in the mezzanine loan agreement as the "9th day of each calendar month during the term of the Loan" (emphasis added). Plaintiff argues that the last "Payment Date . . . during the term of the Loan" was November 7th (the business day before November 9th, a Sunday), and thus the last interest period ended on November 14th. This creates sufficient ambiguity concerning what plaintiff's obligations were to prevent us from determining how the provision should be properly interpreted.
Similarly, we are unwilling at this stage to declare that the amount charged by Blackrock was not an unenforceable penalty. The late charge was, according to the agreement, designed "to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment." However, we are unable to determine on the limited record before us whether such damages were incapable of calculation at the time the mezzanine loan agreement was executed, or whether there is a proportional relationship between the consequences to Blackrock of receiving late payment, and the sum plaintiff was required to pay (see Truck Rent-a-Ctr. Inc. v Puritan Farms Snd, 41 NY2d 420 [1977]). None of the cases cited by Blackrock involving a 5% penalty resulted in so large a payment as encountered here, for such a negligible period of default. Furthermore, we are mindful of the unique circumstance here, which is that, while plaintiff was ultimately responsible [*5]for ensuring that the subject properties were covered by the requisite insurance, it was an innocent victim of JP Morgan's agent's failure to fulfill its duty of renewing the policy.
This is not to say that a garden variety dispute over the meaning of contractual terms will serve as the basis of a viable duress claim. It is necessary that the second prong of the duress analysis, which involves the deprivation of meaningful choice on the duress victim's part, also be present. Thus, the possibility, or even the fear, of litigation is insufficient to establish duress (see Oleet v Pennsylvania Exch. Bank, 285 AD 411, 414 [1st Dept 1955]). In Oleet, the defendant lender represented to the plaintiff borrowers, who were seeking a three-year loan, that it could only issue notes for 90 days at a time, but that it would continually extend such notes for the desired three years. However, when the first note became due, the lender told the plaintiffs that it would only extend the note if the plaintiffs, inter alia, paid certain charges to it. This Court rejected the plaintiffs' duress claim, stating:
"At the time the extension agreement was executed, the bank had no interest in or control over plaintiffs' business or property. All the bank had was a claim for repayment of a loan, represented by ninety-day notes. Despite their financial distress, the borrowers could have refused to honor the fraudulently induced notes, thereby compelling the bank to institute suit, in which event the defense of fraud and, perhaps, equitable estoppel would have been available to them. Fear of financial embarrassment not created by the bank or the stress that might follow from a lawsuit brought to enforce the notes, is not sufficient to constitute such duress as will excuse or invalidate an agreement made to avoid such consequences. An impending suit, without more, does not create the cognizable impulsion of duress" (id., internal citations omitted).
Here, plaintiff's duress claim derives not from a fear it had that, should it demur from Blackrock's insistence that it pay the late charges and extra interest, thus foregoing its ability to refinance, Blackrock would merely sue to recover the mezzanine loan. Rather, plaintiff claims that it feared that Blackrock would foreclose on plaintiff's very valuable portfolio of properties. For this reason, it asserts, it was placed in a position where, even though it doubted Blackrock's entitlement to the charges, it had no choice but to comply with Blackrock's demand. Indeed, "economic duress is established when the facts show that [breach of a contractual obligation] will result in an irreparable injury or harm" (Sosnoff v Carter, 165 AD2d 486, 491 [1st Dept 1991]). Furthermore, as this Court observed in Oleet, a demand can be characterized as improper when it is based on "a claim insignificant when contrasted with the demands" (285 AD at 415). Here, plaintiff contends that there is a gross disproportionality between the claim (a payment that was one week late) and the demand (nearly $850,000).
That plaintiff may have established a question whether Blackrock may have had a right to extract the late charge from it does not compel a decision upholding the complaint, for while there is a question whether Blackrock acted reasonably in imposing the penalty, we must also consider the consequence of plaintiff's failure to seek recovery of the payment after the threat of foreclosure had passed. "[O]ne who would recover moneys allegedly paid under duress must act promptly to make his claim known" (Austin Instrument v Loral Corp., 29 NY2d 124, 133 [1971]). That is because a contract procured by duress is not void, but merely voidable, such that the duress victim's failure to act can be viewed as a ratification of the contract (see Oregon Pac. R.R. Co. v Forrest, 128 NY 83, 91-92 [1891]). Plaintiff dismisses this principle as inapplicable here because Blackrock did not procure a contract by duress, but rather a payment concomitant with an already existing contract. This appears to be a distinction without a difference. Plaintiff [*6]does not explain why a payment like the one at issue is void (not simply voidable), nor does it offer any authority to support that contention. Indeed, in Austin Instrument, a party was held to have procured price increases on an already existing contract through economic duress, and the Court still weighed whether the victim of that duress had ratified the price increase by waiting too long to seek recovery (29 NY2d at 133).
Plaintiff further asserts that the proper analysis where a party fails to promptly seek recovery of a payment made under duress is whether it is guilty of laches. It argues that because a showing of laches requires prejudice on the part of the party asserting the defense, it must prevail here, because Blackrock was not prejudiced. We disagree. Plaintiff has not cited any authority to support its theory that prejudice enters the analysis. Indeed, decisions by this Court declaring that a party has waived a duress claim have not even suggested that prejudice is a relevant factor (see Achache v Och, 128 AD3d 563 [1st Dept 2015]; Kaminsky v Herrick, Feinstein LLP, 59 AD3d 1, 13-14 [1st Dept 2008], lv denied 12 NY3d 715 [2009]). This is not to say that a lengthy wait to recover funds paid under duress bars the claim absolutely. In Austin Instrument, for example, the victim of the duress faced an imminent threat of wrongful compulsion long after it was placed in a position of duress, excusing its delay (29 NY2d at 133). Here, however, plaintiff fails to allege any set of facts justifying its decision to wait nearly two years to invoke duress, and then only after defendant invoked the voluntary payment doctrine. For that reason, its complaint was properly dismissed.
Accordingly, the order of the Supreme Court, New York County (O. Peter Sherwood, J.), entered September 19, 2017, which
granted defendants' motion to dismiss the complaint, should be affirmed, with costs.
All concur.
Order, Supreme Court, New York County (O. Peter Sherwood, J.), entered September 19, 2017, affirmed, with costs.
Opinion by Mazzarelli, J. All concur.
Renwick, J.P., Gische, Mazzarelli, Kern, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: NOVEMBER 15, 2018
CLERK